UNITED STATES of America

v.

Claude L. BLACKWELL, Appellant.

No. 82–1261.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1982.

Decided Dec. 10, 1982.

Larry J. Ritchie, Washington, D.C. (appointed by this Court), for appellant.

Robert K. Reed, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and Percy H. Russell, Jr., Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before ROBINSON, Chief Judge, and WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Chief Judge ROBINSON.

WALD, Circuit Judge:

Following a jury trial on February 1–4, 1982, appellant, Claude L. Blackwell, was convicted of violating 18 U.S.C. app. § 1202(a)(1) (possession of a firearm by a convicted felon) and 22 D.C.Code § 3204 (carrying a pistol without a license). Blackwell was subsequently sentenced to a prison term of two to six years on the D.C.Code offense and a concurrent term not to exceed two years on the federal offense. On this appeal, Blackwell challenges the validity of his conviction on two grounds: (1) that four photographs showing Blackwell holding a gun were admitted into evidence at his trial in violation of Federal Rules of Evidence 901(a), 402, 403, and 404; and (2) that his sixth amendment right to have a witness testify on his behalf was violated by the prosecutor's and the trial judge's warnings to a defense witness that she could be prosecuted for perjury and lose the benefit of her plea bargain if she gave certain testimony. On the evidentiary issue, we hold that the trial court did not commit prejudicial error when it admitted the photographs in question into evidence. On the sixth amendment issue, we hold that the perjury warnings were proper. The warnings to the witness that her plea agreement might be revoked, however, reflected a misunderstanding of Rule 11 of the Federal Rules of Criminal Procedure and may have dissuaded Blackwell from presenting a witness in his defense. Nevertheless, we affirm the conviction because counsel failed to object to those remarks as inaccurate at trial, and they do not constitute plain error so as to be noticeable on appeal.

## I. BACKGROUND

On September 10, 1981, Washington, D.C. police executed a search warrant at the Pitts Hotel, in a room rented by appellant's common-law wife, Lillie T. Robinson. Both Robinson and appellant, Claude L. Blackwell, were present in the room when the search occurred. During their search, the police seized two guns hidden in the room, a .357 magnum Dan Wesson revolver and a .38 Smith & Wesson revolver; a brown canvas bag containing both live and spent .357 and .38 ammunition, weapon cleaning and breakdown tools, a Smith & Wesson box bearing the same serial number as that of the seized .38 revolver, Blackwell's birth certificate, and a pawnbroker's certificate with Blackwell's name and address on it; marijuana; and four color photographs of Blackwell with a revolver similar to the .357 magnum discovered during the search.

Blackwell was subsequently charged with violating 18 U.S.C. app. § 1202(a)(1) (possession of a firearm by a convicted felon),[1] 21 U.S.C. § 844 (possession of marijuana),[2] and 22 D.C.Code § 3204 (carrying a pistol without a license).[3] Robinson was charged

---

1. 18 U.S.C. app. § 1202(a)(1) provides:
   (a) Any person who—
   (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony ... and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

2. 21 U.S.C. § 844 provides, in pertinent part:
   (a) It shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional prac-

tice, or except as otherwise authorized by this subchapter or subchapter II of this chapter. Any person who violates this subsection shall be sentenced to a term of imprisonment of not more than one year, a fine of not more than $5,000, or both, except that if he commits such offense after a prior conviction or convictions under this subsection have become final, he shall be sentenced to a term of imprisonment of not more than 2 years, a fine of not more than $10,000, or both.

3. 22 D.C.Code § 3204 provides:
   No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land

with violating 21 U.S.C. § 844 and 22 D.C. Code § 3204.

On February 1, 1982, the district court accepted a plea agreement by which Robinson pled guilty to the marijuana possession charge in return for the dismissal of the gun possession charge. On the same day Blackwell proceeded to trial on the two weapons charges, the government having dismissed the marijuana possession charge.

At trial, the government introduced into evidence all the weaponry seized during the September 1981 search and several black and white photographs of Robinson's hotel room taken during the search, which showed the two revolvers and their places of discovery, the brown canvas bag, and parts of the hotel room in the background. Over Blackwell's objection, it also introduced the four color photographs of Blackwell discovered during the search.

The defense presented two witnesses: Eleazar Williams, Jr., a friend of Robinson's, and Blackwell himself. Williams testified that on September 9, 1981, Robinson had accompanied him to a gun shop in Virginia, where he bought a .38 revolver and some ammunition.. He then used the .38, as well as his own .357 magnum revolver, for target practice. On their way home, Williams stated, his truck broke down. He left Robinson in charge of the truck and guns and went in search of a friend to help him repair the truck. When he returned several hours later, he discovered that Robinson had left, taking the guns with her. Williams also testified that the guns seized in the search at Robinson's hotel room the next day were his.

Blackwell then took the stand, testifying that he did not live at Robinson's hotel room, but visited there about three times a week. He denied ever seeing the two revolvers before the police discovered them on September 10, 1981. He also stated that the brown canvas bag belonged to Robin-

son; that his birth certificate and the pawnbroker's ticket were on a nightstand in the room, not inside the bag; and that the four color photographs. introduced by the government were taken at another hotel in 1977.

Blackwell had also planned to call Robinson as a defense witness at his trial. Her testimony, Blackwell's attorney later proffered, would have corroborated the testimony of Williams that Robinson, not Blackwell, had brought the guns to the hotel room. In addition, Robinson would have testified that Blackwell did not know of the presence of the guns in the room. Defense counsel first indicated to the trial court that he was going to subpoena Robinson to testify on behalf of Blackwell immediately after she entered her plea of guilty and before trial began. In response to this announcement, the prosecutor stated that he believed Robinson had a fifth amendment privilege not to testify because the charges against her were still pending. Robinson's attorney agreed, telling the court that he had advised her to invoke her fifth amendment privilege against self-incrimination and would like an opportunity to speak with her further on the subject.

On the second day of the trial, Robinson's attorney informed the court that, against his advice, Robinson had decided to waive her fifth amendment privilege. The prosecutor then asked permission to inquire into the voluntariness of Robinson's intended waiver, pointing out that there was a "close relationship" between Blackwell and Robinson and a "very substantial" question of perjury. The trial judge inquired of Blackwell's attorney whether Robinson was going to claim that the two guns were hers; he replied that she was not going to make that claim. The judge then questioned Robinson under oath, advising her that she still retained a fifth amendment privilege because

possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in § 22–3215, unless the violation occurs after

he has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or in another jurisdiction, in which case he shall be sentenced to imprisonment for not more than 10 years.

she had not yet been sentenced and the gun possession charge was therefore still pending against her. The judge also told Robinson that if she testified falsely she would be subject to a charge of perjury. Robinson replied that she still wanted to take the stand and testify.

The court then gave the prosecutor permission to examine Robinson. He questioned her regarding her relationship with Blackwell; whether and when she and Blackwell discussed the possibility of her testifying on his behalf as well as the circumstances and the content of those discussions; why she wanted to testify; and if and why she wanted to waive her privilege against self-incrimination. His final question was, "[D]o you intend to claim possession of these weapons?" Although Robinson answered "No," the court sustained Blackwell's objection to the question, commenting that "if she were going to testify that the guns were hers, she would lay herself open to the case not being dismissed against her." Tr. at 133.

Later in the trial, the defense called Williams to testify. The prosecutor objected, requesting a proffer of his testimony. After Blackwell's attorney described what Williams' testimony would be, the judge commented that she had not understood that Robinson was going to testify that she had possession of the weapons. The judge was disturbed that Robinson would be in the "incriminating situation of bringing the guns into the District of Columbia herself," Tr. at 226, and remarked that if she testified as counsel had proffered, "[w]e obviously couldn't allow [the weapons charge] to be dismissed." Tr. at 228.

Apparently concerned that Robinson still did not understand that merely possessing, rather than owning, the guns would open her up to the gun possession charge, the court then questioned Robinson under oath once again, telling her that if she testified to possession of the weapons in the District of Columbia, she could be found guilty of the gun charge. Robinson replied that the guns were not hers and that she understood that just possessing them would make her liable for a gun possession charge. After this discourse, Blackwell's attorney stated to the court Blackwell's concern that if Robinson testified she would be prosecuted. The court replied, "She will. There is no doubt about it." Tr. at 263.

Immediately after the trial judge made these comments, Blackwell took the stand to acknowledge his understanding that Robinson, should she testify, might be prosecuted on the original indictment for possession of a pistol without a license and could also be prosecuted under Virginia law for transporting weapons into the District of Columbia. As a result, Blackwell stated, he would withdraw the subpoena that had been issued to Robinson.

On February 4, 1982, Blackwell was convicted of both the charged offenses.

## II. ANALYSIS

### A. The Evidentiary Issue

Blackwell argues on this appeal that the trial court's admission of four photographs showing him holding a gun was a clear abuse of discretion because the photographs were unauthenticated and irrelevant. He urges that their admission therefore violated Federal Rules of Evidence 901(a), 402, 403, and 404. In order to authenticate the photographs properly, he contends, the government needed to identify conclusively the place and time the photographs were taken and also to prove that the weapon in the photographs was the same gun seized when he was arrested on September 10, 1981. Because the photographs were not so authenticated, Blackwell concludes, they were irrelevant to the case and inadmissible under the rules of evidence.

### 1. Authentication

As a general rule, tangible evidence such as photographs must be properly identified or authenticated before being admitted into evidence at trial. Fed.R.Evid.

901(a);[4] *Richardson v. Gregory,* 281 F.2d 626, 630 (D.C.Cir.1960); *Mikus v. United States,* 433 F.2d 719 (2d Cir.1970); *United States v. Hobbs,* 403 F.2d 977, 978–79 (6th Cir.1968). Authentication and identification are specialized aspects of relevancy that are necessary conditions precedent to admissibility. 5 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 901(a)[02] at 901–18 (1978); 11 J. Moore and H. Bendix, *Moore's Federal Practice* § 901.01[3.–1]–(a) at IX–7 (2d ed. 1982). Rule 901(a) only requires that the proponent of documentary evidence make a showing sufficient to permit a reasonable juror to find that the evidence is what its proponent claims. *United States v. Sutton,* 426 F.2d 1202, 1207 (D.C.Cir.1969).

■ The sufficiency of a showing of a document's authenticity rests within the sound discretion of the trial judge. *Id.* at 1207; *Jackson v. United States,* 395 F.2d 615, 619 (D.C.Cir.1968); *Richardson v. Gregory,* 281 F.2d at 630. The trial court's determination regarding admissibility will not be overturned absent a clear abuse of discretion. *Id.; United States v. Smith,* 490 F.2d 789, 794 (D.C.Cir.1974) (per curiam).

■ The record in this case indicates that the following actions were taken regarding the showing of authenticity required by Rule 901(a). On the first day of trial, counsel for Blackwell alerted the trial judge that he planned to object to the admission of the photographs on the grounds that the government could not prove that the gun shown in the photographs was the same gun seized during the search in September 1981, that the room in the photographs was the same room as the one in which the search was made, or that the pictures were taken at a time relevant to the charged offenses. The admission of the photographs, Blackwell's attorney argued, would therefore be irrelevant and immaterial to any issue in the case and also highly prejudicial to his client's defense.

In response to this objection, the prosecutor proffered that there would be testimony forthcoming that the photographs showed Blackwell holding a gun that looked exactly like one of the seized weapons, in a room that looked exactly like Robinson's hotel room. The judge thereupon decided that the government would be allowed to introduce the photographs.

The prosecutor did so through his first witness, a police officer who had participated in the search of Robinson's hotel room. The officer, Detective Hampton, testified that the man shown in the photographs was the defendant, Blackwell. She also testified that the room depicted in the photographs looked exactly like the room she had searched in September 1981, pointing to such details as the similarities in the layout of the room in the Pitts Hotel and that shown in the pictures and in the appearance and positioning of the room's chair, nightstand, air conditioner, bed, and draperies. In addition, Hampton testified that the gun in the photographs appeared to be identical to the gun seized during the search. When asked to detail the similarities, she testified:

> The color, the black steel and the brown grips; in the end of the butt of the gun there's a hole that's reflected in the picture; the red inlay or red sights that are marked; the length of the barrel appears to be the same; the cylinder looks the same.
>
> The rod that ejects the shells, the frame around the rod is built the same in this weapon as it is in the one in the picture.

Tr. at 118.

The government also called a firearms examiner with the Washington, D.C. Metropolitan Police Department to testify regarding two of the photographs. He stated that these photographs showed a catalogue put out by the Dan Wesson Company. This catalogue, known as the Dan Wesson Pistol

---

4. Rule 901(a) reads in full:

   (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Pack, described the .38 special and .357 magnum revolvers, the same two weapons found by the police at the Pitts Hotel. In addition, the government introduced several black and white photographs taken during the September 1981 search of Robinson's room. These photographs were available to the jury so that it could compare such details as the appearance of the gun and the hotel room in them with the same details in the four color photographs.

After the introduction of this evidence, a reasonable juror could have concluded that these were photographs of Blackwell, that they showed him with the same gun as one seized during the search, and that the photographs were taken at the Pitts Hotel.[5] The government did not, however, present sufficient evidence to establish with any degree of certainty *when* the photographs were taken. Proper authentication requires not only that the government identify the scene depicted in the photographs, but also their coordinates in time and place. *See United States v. Stearns,* 550 F.2d 1167, 1171 (9th Cir.1977). Although the prosecutor did ask Detective Hampton if she knew when the pictures were taken or when Rob-

inson moved into the Pitts Hotel, she was unable to answer either question. The government made no other attempt during its case-in-chief to pinpoint the time when the photographs might have been taken with any degree of certainty.[6]

Fortunately for the government, Blackwell himself provided some information on the relevant time period when he took the stand to testify near the end of trial. Blackwell stated that Robinson had moved into the Pitts Hotel in June of 1981. Based on the marked similarities between the room depicted in the four photographs in question here and the room depicted in the black and white photographs taken during the search of Robinson's room, the jury could reasonably have concluded that the four color photographs had been taken at the Pitts Hotel sometime between June and September 1981. As a result, even if the photographs were not fully authenticated by the prosecution and their admission into evidence premature, any error was cured by the testimony of the defendant before the close of the trial. A new trial is therefore not required on this ground.[7]

5. Although the four photographs were received into evidence before either Williams or Blackwell testified for the defense, the prosecutor's cross-examination of the two men provides further authentication of the photographs. Williams identified Blackwell as the man shown in three of the photographs with a .38 revolver and testified that a Dan Wesson Pistol Pack catalogue was shown in two of the photographs. Blackwell admitted on direct examination that he was the person shown in the photographs with a gun, but denied that they had been taken in Robinson's hotel room, testifying that they had been shot in another hotel in 1977. On cross-examination, Blackwell admitted that the layout and furnishings of the room shown in both the black and white and color photographs appeared to be the same.

6. On February 3, 1982, the prosecutor informed the court that he wanted to call a Polaroid Company official to testify that the type of film used in the four color photographs in question had not been produced until June 1980 and that a code on the back of the photographs indicated that that particular type of picture had not been produced before September 1980. He also stated that he had discovered that the Dan Wesson Pistol Pack catalogue pictured in the photographs was produced in June 1981 and

hoped to be able to get a Dan Wesson employee to testify to that fact. The trial judge, however, refused to delay the trial any longer than a half hour or so; as a result, these witnesses were never presented.

7. The Ninth Circuit has reached the same result in a similar case. *United States v. Stearns,* 550 F.2d 1167 (9th Cir.1977). In *Stearns,* the court held that the trial court committed error when it admitted certain photographs into evidence before crucial testimony providing the key to authenticating all the photographs as to time and place was before the court. The proper course of action, the court stated, would have been for the trial judge to admit the evidence conditionally or to refuse to admit it until sufficient evidence of authenticity had been adduced. But because all of the authenticating evidence needed to support admission of the photographs was introduced before the close of the prosecution's case-in-chief, the photographs were not used to elicit further real or testimonial evidence pertaining to the defendant's guilt, and the jury did not view the photographs until the end of trial, the premature admission of the photographs was deemed harmless error. *Id.* at 1172.

## 2. Relevance

In addition to being properly authenticated, the photographs must also be relevant to some matter at issue in the trial. *United States v. Hurt,* 476 F.2d 1164, 1170 (D.C.Cir. 1973) (per curiam); *United States v. Hobson,* 519 F.2d 765, 776 (9th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975). The test for relevance set out by Rule 401 refers to evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The photographs in question here were clearly relevant to the prosecution's contention that Blackwell had a .38 and a .357 revolver in his possession at the Pitts Hotel. Certainly, photographs showing the defendant holding a gun similar to one seized after his arrest in a room nearly identical to the room in which he was arrested have the tendency to make it more likely that the seized guns were in his possession at the time of their discovery.

■ Relevant evidence may be inadmissible under Rules 403[8] and 404,[9] however, if its probative value is outweighed by its inflammatory, prejudicial, or misleading nature or if it has been introduced solely to show the defendant's propensity to commit the crime with which he has been charged. *See United States v. Smith,* 490 F.2d at 794;

*United States v. Hurt,* 476 F.2d at 1170; *Harried v. United States,* 389 F.2d 281, 287 (D.C.Cir.1967). The probative value of these photographs would have been extremely high if it had been conclusively proven that the gun and room in the photographs were identical to the seized gun and the room at the Pitts Hotel and that the photographs were taken a short time before Blackwell's arrest. This, of course, was not the case. As a result, the probative value of the photographs is diminished, even though the gun and the room in the photographs closely resemble the seized gun and the Pitts room. In addition, the defendant may have been prejudiced by the admission of the photographs. One of the charges against Blackwell concerned possession of a firearm by a convicted felon. The photographs may have led the jury to believe that even if Blackwell had not possessed the guns found at the Pitts Hotel he had had *some* guns in his possession since his felony conviction. There is also some likelihood that the jury, after viewing these photographs, may have been prejudiced by Blackwell's stance in one of them (holding a gun in firing position) and by his apparent ease and familiarity in the presence of weapons.[10]

■ In striking a balance, the trial court did not err in finding that the dangers associated with admitting the photographs

8. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

9. Rule 404 provides:

(a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prose-

cution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(3) Character of witness. Evidence of the character of a witness, as provided in rules 607, 608, and 609.

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

10. Apparently, Blackwell did not request a limiting instruction from the judge instructing the jury as to exactly what inferences they could and could not draw from the photographs.

did not outweigh their probative value.[11] Even though it was not conclusively proven that the room shown in the photographs was the Pitts Hotel room or that the gun seized was the same gun appearing in the photographs, those photographs did make it significantly more likely that they were the same room and the same gun and that, as a result, Blackwell was guilty of the charged crime of possession. In sum, the district court did not abuse its discretion when it admitted the photographs into evidence.

## B. The Sixth Amendment Issue

■ The Sixth Amendment preserves the right to the defendant "to have compulsory process for obtaining witnesses in his favor." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967), clearly established that a party's right to present his own witnesses in establishing a defense is a fundamental component of due process:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*See also Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense").

Blackwell argues that he was unconstitutionally denied his right to obtain witnesses in his favor when the combined actions of the trial judge and the prosecutor forced him to abandon his plan to call Robinson as a defense witness. According to Blackwell, Robinson was prepared to testify that she had transported the two guns from Virginia to the District of Columbia, that the guns were in her possession, not Blackwell's, and that Blackwell knew nothing about them. When the judge and the prosecutor told Robinson she might then be prosecuted for perjury and for possession and that her plea bargain would be repudiated if she so testified, however, Blackwell was forced, he contends, to decline to call her as a defense witness.

The government argues that the actions of the trial judge and the prosecutor were designed merely to protect Robinson's fifth amendment privilege against self-incrimination. There is no conviction after a plea or verdict of guilty, the government contends, until the court enters a judgment and imposes a sentence. Because the trial court had not yet sentenced Robinson, its argument runs, she remained in danger of incriminating herself on the gun charge, which was to be dismissed only when she was sentenced for possession of marijuana. The trial court and prosecutor were genuinely concerned, the government suggests, that Robinson did not truly understand that there was no difference between temporary possession and legal ownership of the guns for the purposes of opening herself up to prosecution. In addition, the government points out, the efforts of the trial court and the prosecutor did not intimidate Robinson since at no time did she ever refuse to testify.

Various types of governmental and judicial interference have been found to deprive the criminal defendant of the right to present his own witnesses to establish a defense. *See, e.g., Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam) (defense witness effectively driven off witness stand by remarks of trial judge regarding the penalties for perjury); *Unit-*

---

**11.** For a similar decision in the Ninth Circuit, see *United States v. Abraham,* 617 F.2d 187, 190 (9th Cir.), *cert. denied sub nom. Huguley v. United States,* 447 U.S. 929, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980) (in prosecution for armed robbery, relevance of cap found on afternoon of robbery near where vehicle used in robbery was abandoned and photographs showing defendant allegedly wearing the same cap outweighed any prejudicial effect; trial court did not abuse its discretion in admitting such evidence).

ed States v. Smith, 478 F.2d 976 (D.C.Cir. 1973) (defense witness told by prosecutor that if he testified as indicated by other testimony he could or would be prosecuted for carrying a concealed weapon, obstructing justice, and as an accessory to murder); United States v. MacCloskey, 682 F.2d 468 (4th Cir.1982) (U.S. Attorney telephoned defendant's girlfriend's attorney to advise him to remind his client that if she testified at trial she could be reindicted on dropped charges); United States v. Goodwin, 625 F.2d 693 (5th Cir.1980) (defense witnesses intimidated by threats of prison officials conditioned upon whether the witnesses testified at trial); United States v. Hammond, 598 F.2d 1008 (5th Cir.1979) (defense witness threatened by FBI agent with retaliation in other cases pending against him); United States v. Henricksen, 564 F.2d 197 (5th Cir.1977) (per curiam) (defense witness intimidated by terms of his plea bargain in another case); United States v. Thomas, 488 F.2d 334 (6th Cir.1973) (per curiam) (defense witness told by secret service agent during recess of trial that he would be prosecuted for a felony if he testified); Berg v. Morris, 483 F.Supp. 179 (E.D.Cal. 1980) (trial court coerced witness into giving inculpatory evidence by twice warning him that his probation would be revoked and perjury charges filed if the truth were not told). There are two alleged sources of judicial and prosecutorial misconduct in this case: (1) the warnings of the trial judge and prosecutor that Robinson's testimony could open her up to charges of perjury; and (2) their statements that if Robinson testified as had been proffered the gun charge scheduled to be dismissed as part of her plea bargain would not be dismissed. We find that the warnings concerning perjury were proper, and that the judge's and the prosecutor's comments telling Robinson that the gun charge could be reinstated, while reflecting an erroneous construction of Fed.R.Crim.P. 11, did not constitute "plain error" under the circumstances of this case so as to justify reversal of Blackwell's conviction.

### 1. Perjury Warnings

The constitutional right of a criminal defendant to call witnesses in his defense mandates that they be free to testify without fear of governmental retaliation. It is not improper per se for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. See, e.g., United States v. Simmons, 670 F.2d 365 (D.C.Cir.1982) (per curiam). But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify. See Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330; United States v. Harlin, 539 F.2d 679 (9th Cir.), cert. denied, 429 U.S. 942, 97 S.Ct. 362, 50 L.Ed.2d 313 (1976); United States v. Morrison, 535 F.2d 223 (3d Cir.1976); Berg v. Morris, 483 F.Supp. 179.

The prosecutor and trial judge in this case each warned Robinson of the consequences of perjury on only one occasion. When the prosecutor first heard, on the second day of trial, that Robinson had decided to waive her privilege against self-incrimination and testify as a defense witness, he asked permission of the court to inquire into the voluntariness of her intended waiver, citing the "close relationship" between Blackwell and Robinson and pointing out that a "very substantial question of perjury" was involved. The trial judge then questioned Robinson under oath, stating:

> there are always actions of perjury meaning that if you lie under oath that you can be sent away on a new charge.
> Do you understand that?
> THE WITNESS: Yes.
> THE COURT: So it is important for everybody to tell the truth. I just want you to understand what the situation is. All right?
> THE WITNESS: Thank you.
> THE COURT: Do you still wish to take the stand and testify?
> THE WITNESS: Yes.

Tr. at 130. The record reveals no other warnings to Robinson regarding the dangers of committing perjury.

The conduct of the judge and the prosecutor just recounted does not begin to approach the level of misconduct described in *Webb v. Texas* or *United States v. Morrison.* In *Webb,* for example, the Supreme Court reversed a conviction for burglary when a trial judge gratuitously and at great length warned a witness of the dire consequences of committing perjury. The trial judge had told the witness:

> If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

409 U.S. at 96, 93 S.Ct. at 352. The Supreme Court held that these "threatening remarks" had effectively driven the witness off the stand, thereby depriving the defendant of due process of law. *Id.* at 98, 93 S.Ct. at 353.

In *Morrison,* the prosecutor sent at least three messages to a potential defense witness through her attorney warning her that, if she testified, she was liable to prosecution, that her testimony would be used as evidence against her, and that it would be possible to bring federal perjury charges against her. In addition, he subpoenaed the witness and had her brought to his office for an intimidating personal interview, telling her during the interview that

> if she testified falsely ... she could subject herself to a perjury charge, and I told her that even though the charges were dismissed against her as an adult on the dope charge itself, that if she testified falsely she was now an adult over 18, and if we could prove it, and she was testifying falsely on behalf of [the defendant] thinking to get her to lie to exculpate himself and get off the hook, she could be prosecuted for perjury, and she should know that.

535 F.2d at 226. As a result of these activities on the part of the prosecutor, the court held that the defendant's constitutional right to have this particular witness' freely given testimony had been infringed. *Id.* at 228.

Rather, this case falls within this circuit's rule requiring more than a mere warning regarding the dangers of perjury before reversal of a criminal conviction is warranted. *United States v. Simmons,* 670 F.2d 365. In *Simmons,* this court remanded a case to the district court for a full hearing on the defendant's charge of prosecutorial misconduct; at the same time, however, we stated that "[i]t is hardly a threat for a prosecutor to advise a potential witness, who is telling two stories with respect to a defendant's criminal involvement, that he might be prosecuted for perjury if he testifies falsely." [12] *Id.* at 371. *See also United*

---

12. On remand, the trial court declined to grant a new trial even though it found that the prosecutor had a prisoner brought to his office so that he might find out what he intended to testify to at the trial of his co-defendant, lectured the prisoner on the consequences of committing perjury for two to three minutes, and engaged in an exchange of obscenities with him. *United States v. Simmons,* No. 80–504, slip op. at 6 (D.D.C. July 28, 1982). The court held that, even though it may have been a mistake for the prosecutor to meet with the potential witness without giving his attorney an opportunity to be present, the prosecutor's conduct did not deprive the defendant of a fair trial or the ability to call a witness in his defense. *Id.* at 6–7. The witness, the court found, invoked the fifth amendment for reasons other than prosecutorial intimidation and his

*States v. Harlin,* 539 F.2d 679 (trial court did not deprive defendant of due process when it stated in his presence to counsel representing a codefendant that "I assume you have advised her of the penalties of perjury ... and that if it appears that a defendant is lying, the Court can take that into account, too").

The trial judge and prosecutor in this case stayed well within acceptable limits in their warnings to Robinson regarding the potential dangers of committing perjury if she testified. Their conduct in this regard gave rise to no legitimate constitutional complaint.

2. *Warnings on Reinstatement of the Dismissed Charge*

a. *Violation of Rule 11*

█ During trial, the judge repeatedly stated and the prosecutor suggested on one occasion that the gun charge which was to be dropped as part of Robinson's plea bargain would be reinstated if she testified in Blackwell's defense that she, not Blackwell, had brought the guns into the hotel room. These warnings, in our view, reflected a serious misunderstanding of Fed.R.Crim.P. 11 on the part of the trial judge.

On the first day of Blackwell's trial, Robinson pled guilty to possession of marijuana in return for the dismissal of a gun possession charge. Immediately after the trial judge accepted the plea, Blackwell's attorney indicated that he was going to call Robinson to testify in Blackwell's behalf. At that time, the prosecutor stated that Robinson had a fifth amendment privilege not to testify because "the charges are still pending," implying that she could still be prosecuted on the charge scheduled to be dismissed in the plea. Blackwell's counsel did not object to the accuracy of the prosecution's remarks on the status of the gun charge.

The next day Robinson's attorney informed the court that Robinson planned to waive her fifth amendment privilege and testify for the defense. The judge then questioned Robinson, informing her that

testimony would have provided little support to

I just wanted to be sure that you understand that, first of all, you have an absolute right not to testify in this case, as you know; you have a right to testify.

You have been subpoenaed and you have a Fifth Amendment right, *because you haven't been sentenced yet and you still have your charges hanging over your head.*

*The only understanding was that they would be dismissed at the time of sentence.*

*Now, it would work against you, as I am sure you understand....*

Tr. at 129–30 (emphasis added).

The judge reiterated this point several times during Blackwell's trial. When the prosecutor asked Robinson, who was called to the stand at the request of the judge, whether she would claim possession of the weapons if she testified, the trial judge sustained defense counsel's objection to the question, commenting that "if she were going to testify that the guns were hers, she would lay herself open to the case not being dismissed against her." Tr. at 133. At another point in the trial, the judge indicated her concern that Robinson would be in the "incriminating situation of bringing the guns into the District of Columbia herself," Tr. at 226, and remarked that if she testified as defense counsel proffered, "[w]e obviously couldn't allow [the weapons charge] to be dismissed." Tr. at 228. The judge also informed Robinson personally that if she testified that she possessed the guns in the District of Columbia, she "could be found guilty of the gun charges." Tr. at 261. At no time did Blackwell's counsel indicate disagreement with or object to the judge's warnings concerning the gun charge.

Near the end of the trial, however, Blackwell's attorney mentioned to the court Blackwell's concern that if Robinson testified she would be prosecuted. The court answered, "She will. There is no doubt about it." Tr. at 263. Immediately there-

the defense. *Id.* at 7–8.

after, Blackwell withdrew his subpoena for Robinson, stating under oath that he was doing so because if she testified she could still be prosecuted on the original gun charge and because it was at least conceivable that she might also invite prosecution for violations of Virginia law for transporting weapons into the District of Columbia.

Our reading of Fed.R.Crim.P. 11 persuades us that both the judge and the prosecutor were bound by the plea agreement accepted by the court on the first day of the trial. Neither had the power to renege on the agreement as to dismissal of the gun charge.[13]

▐ As far as the prosecutor is concerned, it is no longer open to question that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). As this court recently stated in *United States v. Pardo,* 636 F.2d 535, 543 (D.C.Cir.1980), "promises to dismiss charges as part of a plea agreement are binding on the Government." As a result, "a witness may not be exposed to prosecution on [the dismissed] charges." *Id.* Thus, in this case the government could not have refused to keep its promise to dismiss the gun charge simply because Robinson subsequently testified in Blackwell's defense.[14] Consequently, it was misleading for the prosecutor even to suggest that this might occur.[15]

---

**13.** The question is not, as the government argues, simply one of whether Robinson retained a fifth amendment privilege against self-incrimination. Robinson probably did retain a privilege due to the possibility of Virginia weapons prosecution. The issue is whether the misinformation conveyed by the prosecutor and trial judge as to the likelihood of prosecution on the original gun charge motivated Blackwell not to call Robinson as a defense witness and constituted so serious an error as to require remand even though unobjected to at trial.

**14.** The government admitted at oral argument that it could not have altered the plea agreement. *See United States v. Mercer,* 691 F.2d 343 at 346 (7th Cir.1982) (if cooperation with government was condition precedent to plea bargain "then the provisions of the plea agreement should have included it, and the court further should have so instructed the defendant prior to acceptance of the plea").

Moreover, it appears extremely doubtful that the prosecution could have required Robinson to agree not to testify in Blackwell's defense as part of the original plea bargain. *See United States v. Pardo,* 636 F.2d 535, 540 n. 15 (D.C.Cir.1980) (government specifically disclaimed any right to enforce the part of a plea agreement which required a potential defense witness to refuse to testify for the defense); *United States v. Bell,* 506 F.2d 207, 222 (D.C.Cir.1974) (government impairment of the accused's ability to call witnesses in his behalf by conditioning its acceptance of the witnesses' pleas upon their refusal to testify for the defendant cannot be tolerated); *United States v. Henricksen,* 564 F.2d 197, 198 (5th Cir.1977) (per curiam) (Department of Justice confesses error for preventing a witness from testifying on behalf of a defendant by informing the witness that if he did testify, the plea agreement would be void and he would be tried on all counts of the indictment).

**15.** We do not think the fortuity that Robinson's sentencing and the formal dismissal of the gun charge had been postponed even though the bargained-for plea itself had been accepted by the judge changes the government's responsibility under *Santobello* to fulfill its promises.

*Santobello,* it is true, decided only that some remedy is constitutionally required when the government improperly declines to honor a plea bargain; it left to state trial court discretion whether vacation of the plea or specific performance of the bargain was appropriate. *See also McPherson v. Barksdale,* 640 F.2d 780 (6th Cir.1981) (federal courts lack supervisory authority to specify the remedy for state prosecutor's breach of plea bargain); *Palermo v. Warden,* 545 F.2d 286, 297 (2d Cir.1976), *cert. dismissed,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977) (remedy for broken plea bargain is discretionary with court).

In several instances, however, federal courts have ordered that the plea bargain be performed and charge concessions carried out. *See United States v. Cooper,* 594 F.2d 12 (4th Cir.1979) (plea bargain proposed by government and accepted by defendant enforced even though government withdrew offer before defendant pled); *United States v. Carter,* 454 F.2d 426 (4th Cir.1972) (charges must be dismissed per agreement); *United States v. Lieber,* 473 F.Supp. 884 (E.D.N.Y.1979) (court orders dismissal of subsequent indictment as violative of plea agreement); *cf. United States v. Grandinetti,* 564 F.2d 723 (5th Cir.1977) (resentencing ordered because prosecutor violated agreement by expressing reservations about agreed-upon

█ Robinson's plea to the drug charge was expressly based on the government's promise to dismiss the gun charge at the time of sentencing. Once she accepted that plea on the record, we believe that the trial judge was also without authority to vacate the plea and order reinstatement of the gun charge. Although, as pointed out in *Santobello*, 404 U.S. at 262, 92 S.Ct. at 499, there is "no absolute right to have a guilty plea accepted," and "[a] court may reject a plea in exercise of sound judicial discretion," once a judge has accepted a plea and bound the defendant to it, she cannot, except possibly for fraud, refuse to carry through on the bargain. Even if the trial judge at the time the plea was offered might have questioned Robinson about her intentions to testify in favor of Blackwell, and even if she might have refused to accept the plea if Robinson had indicated that she would so testify, once the plea was accepted the judge no longer had discretion to repudiate the agreement because of Robinson's subsequent testimony.

We base this conclusion on the straightforward language of Fed.R.Crim.P. 11, which states that the judge shall indicate on the record at the time a plea is offered whether she will accept it, reject it, or defer the decision. *See* Rule 11(e)(2); 8 *Moore's Federal Practice* ¶ 11.05[2] at 11–90. In addition, Fed.R.Crim.P. 11(e)(3) makes it mandatory, if the trial judge accepts a plea agreement, that she tell the defendant that she *will* incorporate in the judgment and sentence the disposition provided for in the plea agreement. "This serves the purpose of informing the defendant immediately that the *agreement will be implemented*." [16] Fed.R.Crim.P. 11 advisory committee note, 1974 amendment (emphasis added).

There is no dispute that the trial judge here accepted the guilty plea and that its bargained-for predicate, the dismissal of the gun charge at the time of sentencing, was set out on the record and accepted by her as well. Indeed, the trial judge expressly warned Robinson when she accepted her plea that "in the event that you should want to withdraw this plea before the imposition of sentence, the Court would tell you that because we are ready to proceed to trial right now, you would not be permitted to do that either." Transcript of plea at 3–4. The plea and the bargain were sealed at that point,[17] and we know of no authority for the judge, short of evidence of fraud,[18] to change her mind as to the wis-

---

sentence in plea bargain). *See, generally,* Westen and Westin, *A Constitutional Law of Remedies for Broken Plea Bargains,* 66 Cal.L.Rev. 471 (1978).

Here, the only appropriate remedy for the government's failure *to* perform, in *light* of Robinson's plea and the judge's admonition to her that she could not withdraw it before sentencing, would have been specific performance of the agreement.

**16.** *See also* Note, *Revised Federal Rule 11: Tighter Guidelines for Pleas in Criminal Cases,* 44 Fordham L.Rev. 1010, 1014, 1014 n. 33 (1976):

At the arraignment or other pre-trial hearing at which the plea is offered the court, the judge may accept or reject it, or defer decision until he has considered the presentence report. Upon deciding to accept the plea, the judge must inform the defendant that the sentence will be as provided in the agreement. Because failure by the judge or prosecutor to keep a plea bargain promise generates "an outraged sense of fairness," many appellate courts have traditionally reversed convictions for this failure.

**17.** While the judge could not disavow the plea bargain once accepted, she would presumably have been permitted by Rule 11 to take into account Robinson's subsequent testimony in imposing the *sentence* given to Robinson since no sentence had been agreed upon in the plea. *See* J. Bond, *Plea Bargaining and Guilty Pleas* § 6.17(f) at 6–45 (2d ed. 1982), and cases cited therein.

**18.** *See id.* § 6.18(f) at 6–56: Because there is no suggestion by the government that any kind of fraud was perpetrated during the plea bargaining here, we need not be concerned with the precise scope of the fraud exception to the rule that the judge is bound to carry out the plea agreement once she has accepted it. Presumably, it is aimed at penalizing deceitful behavior engaged in during the negotiating of the plea agreement, in its presentation to the court, or in its execution by the defendant. *See Hamlin v. Barrett,* 335 So.2d 898 (Miss.1976) (defendant deliberately concealed prior felony when questioned by judge at time plea accepted for promise of probation).

The government conceded at oral argument that the judge's power to vacate a plea on the

dom of the bargain and refuse to enforce it.[19]

Indeed, Rule 11's requirement that the judge make a definite announcement of acceptance, rejection, or deferral of her decision about a plea bargain is indispensible to a criminal justice system so heavily dependent on plea bargaining. *See Santobello v. New York,* 404 U.S. at 260, 92 S.Ct. at 498 (plea bargaining is "an essential component of the administration of justice"). Pleas that bind only the defendant, or even the prosecutor and the defendant, but not the judge, would be unfair to the defendant and would dilute the incentive for defendants to plead at all. If compliance with the terms of a plea bargain were to be dependent on some implied but unannounced conditions of good behavior between the acceptance of the plea and the imposition of the sentence, the advantages to the defendant of pleading guilty would be substantially reduced. Rule 11 appears to speak unequivocally; if the plea is accepted, the

judge does not announce any deferral of that acceptance, and the defendant adheres to the terms of the bargain, all parties to it are bound. Although the rule does permit deferral of the decision to accept or reject the plea, usually for the purpose of viewing the presentence report, the mere postponement of the sentencing itself to a future date does not authorize the judge to remake or vacate the plea bargain for whatever reasons later seem appropriate to her.

The judge's faithful observance of the requirements of Rule 11 is just as vital to the fairness and efficiency of the process as the prosecutor's compliance. She has a primary duty under that rule to insure not only that the terms of the bargain are understood by the defendant but that they are adhered to by both sides, as well as by the court itself. That, we believe, is the purpose of Rule 11's insistence that there be a public record of the terms of plea bargains.[20]

basis of subsequent events was "unsettled." It made an attempt to justify such action here by asserting that Robinson and Blackwell's attorney misled the court *at trial* as to whether Robinson would claim possession of the guns. We cannot find any basis for this argument in the record: our reading of the transcript suggests that Robinson was merely confused as to the legal distinction between "possession" and "ownership" of the guns. *See* Tr. at 129, 133, 225–28, 260.

**19.** Although we have found no federal cases precisely on point, several state courts have held, in analogous situations, that a trial judge has no authority to vacate, *sua sponte,* a validly accepted guilty plea because of subsequent events which do not impugn the validity of the original plea agreement. *See, e.g., Lombrano v. Superior Court,* 124 Ariz. 525, 606 P.2d 15 (1980) (trial court could not *sua sponte* set aside guilty plea); *People v. Matthews,* 71 A.D.2d 864, 419 N.Y.S.2d 192, 193 (1979) (memorandum by the court) (a plea of guilty is a conviction and, in the absence of fraud, the court has no power to set aside the plea without the defendant's consent); *accord People v. Hardin,* 67 A.D.2d 12, 414 N.Y.S.2d 320, 322 (1979); *People v. Damsky,* 47 A.D.2d 822, 366 N.Y.S.2d 13 (1975) (per curiam) (trial court had no inherent authority to grant government's application and set aside defendant's plea without defendant's consent). *But cf. State v. Wenzel,* 306 N.W.2d 769, 771 (Iowa 1981) (trial court could reject plea agreement at time of sentencing even though court had accepted

agreement if defendants allowed to withdraw guilty pleas).

*See also United States ex rel. Selikoff v. Commissioner of Correction,* 524 F.2d 650, 653, n. 1 (2d Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976) (citing state cases with approval). In *Selikoff,* the defendant had sought a writ of habeas corpus on the ground that a state trial judge's failure to fulfill promises regarding sentencing made to defendant when he entered a plea agreement denied defendant due process of law. The Second Circuit held that because the trial judge was precluded as a matter of law from making an unconditional promise as to sentence at the time the guilty pleas were accepted because he had not yet seen the presentence report and because the judge specifically noted that his agreed-upon sentence was predicated on the facts known to him at the time, the defendant was not entitled to specific performance. *Id. Cf. United States v. Mercer,* 691 F.2d 343, at 345 (vacation of plea required where judge committed "breach of the plea agreement, and of the understanding conveyed by the district judge, prior to acceptance of the change of plea"); *United States v. Gilligan,* 256 F.Supp. 244 (S.D.N.Y.1966) (vacation of plea necessary where original sentence promised by judge not followed).

**20.** Fed.R.Crim.P. 11(g) requires that "[a] verbatim record of the proceedings at which the defendant enters a plea shall be made and, if

In this case, perhaps inadvertently but nonetheless certainly, the trial judge misled both Robinson and Blackwell by stating that the gun charge to be dismissed as part of Robinson's plea agreement could still be prosecuted. This information, moreover, had a definite potential for infringing Blackwell's sixth amendment right to present witnesses in his own defense. Since counsel failed to raise the proper objection at trial to the warnings of reinstatement,[21] however, we must now decide whether the error was evident enough and the resultant prejudice to Blackwell attributable to the warnings grave enough to constitute "plain error" requiring reversal of Blackwell's conviction. Although the question is a close one, we conclude that the error was not plain, and therefore affirm the conviction.[22]

### b. *Plain Error*

Fed.R.Crim.P. 52 recognizes three classes of errors, two explicitly and one implicitly: first, errors that do not prejudice the defendant are considered "harmless" and disregarded on appeal, whether or not objected to at trial; second, errors that may have been prejudicial and were objected to at trial are deemed "reversible"; and third, errors that are so fundamental a violation of the defendant's rights that they require reversal regardless of the defendant's failure to object to them at trial are termed "plain." 3A C. Wright, *Federal Practice and Procedure: Criminal 2d* § 851 (1982). Rule 52(b) allows appellate courts to correct "[p]lain errors or defects affecting substantial rights" although they were not brought to the attention of the trial court. *See United States v. Frady,* 456 U.S. 152, 163,

---

there is a plea of guilty or nolo contendere, the record shall include, without limitation, the court's advice to the defendant, the inquiry into the voluntariness of the plea *including any plea agreement,* and the inquiry into the accuracy of a guilty plea" (emphasis added).

**21.** The closest Blackwell's attorney came to a relevant objection occurred in the following response to the prosecutor's assertion that Robinson still retained a fifth amendment privilege even though her guilty plea had just been accepted:

MR. ABBENANTE: Your Honor, it's my understanding that the Fifth Amendment privilege is available to Miss Robinson under certain circumstances.

I would submit, under these circumstances, in light of the fact that the government has agreed, pursuant to the plea agreement here, that they will not prosecute her for any offenses that she's been charged with in the indictment, as a result of her plea agreement, that she does not have the same—she does not stand in the same position to invoke the Fifth Amendment privilege as other potential defendants.

She has entered into a plea agreement voluntarily, upon the advice of counsel, the agreement has been made, it's part of the Court record, and there is no agreement that she will, in fact, testify for the government, as I understand the proffer that has been made to the Court....

Tr. at 62–63.

Neither then nor later, however, did he enter a specific objection that the references to prosecution on the gun charges were legally erroneous. Blackwell's newly appointed counsel on

appeal, however, *did argue that the judge was* compelled to fulfill the plea agreement.

**22.** We have discussed the merits of whether the trial judge's actions constituted error for several reasons. First, unlike the majority of plain error cases, the legal issue involving Rule 11 has not previously been decided by this court. We believe that the trial judge's threat to renege on the bargain was a clear violation of Rule 11 with serious implications for the everyday business of the district court; our enunciation of the appropriate legal interpretation of Rule 11 is designed to avoid repetition. Second, although we find no fault with Chief Judge Robinson's concurring statement that constitutional questions should preferably be decided on a complete record, here we are deciding only that the trial judge misinterpreted Rule 11 on the record before her. Because Blackwell did not persist in calling Robinson as a witness, however, we do not find that the misinterpretation deprived Blackwell of his sixth amendment right to present witnesses in his favor. In addition, since a decision as to whether plain error has occurred inevitably means that the government had no opportunity to respond below, that situation is not unique to this case. Finally, we note that appellate courts, including our own, in deciding whether plain error has occurred, often find it necessary to decide first if there has been error at all. *See, e.g., United States v. Herron,* 567 F.2d 510, 514 (D.C.Cir.1977); *United States v. Pinkney,* 551 F.2d 1241 (D.C.Cir.1976); *United States v. Bass,* 535 F.2d 110 (D.C.Cir.1976); *United States v. Peterson,* 509 F.2d 408 (D.C.Cir.1974); *United States v. Giese,* 597 F.2d 1170, 1199 (9th Cir.1979).

102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982); *United States v. Alston,* 551 F.2d 315, 320–21 (D.C.Cir.1976); *United States v. Williams,* 463 F.2d 958, 962 (D.C.Cir.1972); *United States v. McClain,* 440 F.2d 241, 245 (D.C.Cir.1971).

■ Although a cursory reading of the rule would seem to require only that the unobjected-to error be a plain one (*i.e.,* so obvious that the judge should have recognized it on her own) or that it affect substantial rights (*i.e.,* that it not be harmless), the case law on which the rule rests requires much more. According to the Supreme Court's latest pronouncement, the plain error rule is to be "used sparingly" and only "in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady,* 456 U.S. at 163 n. 14, 102 S.Ct. at 1592 n. 14. From that we surmise that neglected error must rise to a level far above that required to survive Rule 52(a)'s ban against reversals for harmless error.[23]

■ On the basis of a careful weighing of the factors discussed below, we find that the error in this case, while probably "reversible" if objected to at trial, does not rise to the level of error so "obvious and substantial" or so "serious and manifest," 3A C. Wright, *Federal Practice and Procedure: Criminal 2d* § 856 at 336, that it affects the very integrity of the trial process, and requires reversal of Blackwell's conviction. We do not find this to be a situation where a defendant is "convicted in a way inconsistent with the fairness and integrity of judicial proceedings, [and where] the courts should invoke the plain error rule in order to protect their own public reputation." *Id.* at 341; *United States v. Atkinson,* 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936).

### (1) *The Substantiality of the Right Affected*

Rule 52(a) mandates that errors at trial that do not affect substantial rights of the defendant are insufficient to reverse a criminal conviction on appeal. Although the Supreme Court has held that some constitutional rights are "so basic to a fair trial that their infraction can never be treated as harmless error . . .," *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), and four circuits have held that intimidation of defense witnesses requires reversal without a showing of prejudice, *see United States v. Hammond,* 598 F.2d at 1013; *United States v. Morrison,* 535 F.2d at 228; *United States v. Thomas,* 488 F.2d at 336; *Bray v. Peyton,* 429 F.2d 500, 501 (4th Cir.1970) (per curiam); *see also United States v. MacCloskey,* 682 F.2d at 479; *Berg v. Morris,* 483 F.Supp. at 186–87, more recently the Court has stated that "interests protected by the Sixth Amendment look to the degree of prejudice incurred by a defendant as a result of governmental action or inaction." *United States v. Valenzuela-Bernal,* —— U.S. ——, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982).

On the basis of the trial record in this case, we cannot decide that it could have made no significant difference to the jury if Robinson had testified along the lines suggested in the proffer. *See id.* at 3447 (defendant must show testimony of deported witness "would have been both material and favorable to his defense"). Although the testimony of Williams, Blackwell's only defense witness other than himself, paralleled the proffer for Robinson, the significance of Robinson's nonappearance could not have been lost on the jury. Robinson was Blackwell's common-law wife and the person in whose name the hotel room where the guns were found was rented. The fact that she did not take the stand to corroborate or supplement Williams' testimony as to how the guns came to be found in the Pitts Hotel room or to testify whether Blackwell knew they were there could have been a fatal gap in his defense. Robinson was the only logical person other than Blackwell who might have known the circumstances of the guns' presence in the

---

**23.** *Cf.* 3A C. Wright, *Federal Practice and Procedure: Criminal 2d* § 586 at 337: "the cases give the distinct impression that 'plain error' is a concept appellate courts find impossible to define, save that they know it when they see it."

room and the extent of Blackwell's knowledge of their presence. Indeed, Robinson allegedly told Blackwell's attorney, who then informed the court, that "there was absolutely no way in the world Mr. Blackwell knew that those guns were in the apartment." Tr. at 262. Robinson kept knowledge of her possession of the guns from Blackwell, his attorney stated, because she knew he had a prior record and because she did not want Blackwell to know she had been in Virginia with Williams.

Since the test for prejudice in cases of this type is whether the missing evidence might likely have substantially affected the outcome of the trial, *see United States v. Bass*, 535 F.2d 110 (D.C.Cir.1976); Rule 52(b), we assess the substantiality of the right affected as militating in favor of finding plain error in this case.

### (2) *The Novelty of the Legal Issue Alleged As Plain Error*

As we have pointed out, the error in interpreting Rule 11 was one not previously ruled upon by this court. Indeed, none of the participants at trial—prosecutor, defense counsel, or trial judge—appears to have been aware it was an error. Thus, this is not the case of an obvious error which went unobjected-to in the heat of trial.

A key reason for requiring that an error be objected to if it is to be noticed on appeal is so that a trial court will have a fair and prompt opportunity to cure or prevent the original error, or at least any recurrences. That principle is especially appropriate here, since the misinformation was conveyed on several occasions during trial; an objection the first time might have focused attention on the issue and allowed the judge to retract her warnings, thereby curing any potential harm to Blackwell. Also, if the defendant had objected, the prosecutor might possibly have been able to produce evidence to justify reinstatement of the charges under a fraud exception to Rule 11. If, as we discern the situation here, no objection was made because defense counsel labored under the same misapprehension about the judge's power to reinstate the

gun charge as the judge herself did, that too militates against labelling the error as one that implicates the "fairness and integrity of judicial proceedings" or represents a "miscarriage of justice." We must be very confident before applying the plain error doctrine to issues of first impression in interpreting the Federal Rules of Criminal Procedure, unless the rule in question incorporates a well-established constitutional or legal principle. Since Rule 11 was designed to set up a new uniform structure for the acceptance of guilty pleas, where there had been none before, its correct interpretation and application may require some trial and error. In sum, the lack of prior precedent in the circuit and the novelty of the issue presented militate against calling the judge's mistake plain error.

### (3) *The Defendant's Failure to Preserve His Right*

Finally, the clear causal connection between the misinformation conveyed by the judge's and prosecutor's remarks and the failure of Robinson to testify is weak; thus, we cannot be sure that the Rule 11 violation infringed Blackwell's constitutional right. This concern tilts our decision against a finding of plain error in this case. As the government points out, Blackwell himself abandoned the right to call Robinson to the witness stand.

This circumstance serves to distinguish the case from the usual one in which the witness succumbs to intimidation by the trial judge or the prosecutor and refuses to testify. *See, e.g., Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330; *United States v. Simmons*, 670 F.2d 365; *United States v. Smith*, 478 F.2d 976; *United States v. MacCloskey*, 682 F.2d 468; *United States v. Hammond*, 598 F.2d 1008; *United States v. Thomas*, 488 F.2d 334; *Berg v. Morris*, 483 F.Supp. 179. While we would be reluctant to rule that the same constitutional protections that apply against prosecutorial and judicial acts that directly intimidate a defense witness have no application to acts that motivate a defendant to refuse to expose a particular witness to risk, especially one with whom he has an

intimate family relationship, the peculiar circumstances surrounding Robinson's failure to be called to the stand make us reluctant to reverse the conviction because she did not testify.

We all recognize a potential for abuse if a defendant is allowed to forego calling a key witness solely on his assertion that he is protecting her welfare. It is always possible that the defendant is really refraining from calling a witness because the testimony might not be favorable to him or because the witness intended to raise the privilege on grounds other than the mistaken fear that the charges in a plea bargain could be reinstated. In this case, all we know is that the defendant took the stand immediately after the trial judge's warnings to the witness and testified he would not call her, although he had previously intended to, because of the threat of renewed prosecution on the gun charge and of possible prosecution on a state gun charge. The witness, on the other hand, had only minutes before stated her continued intention to testify. In short, we have no way of knowing what would have actually happened if Blackwell had called Robinson as a defense witness. We have obvious concerns about allowing a defendant to decide for himself when *legal* risks to another person will suffice to permit him to waive his constitutional right to a defense witness and still assign it as plain error on appeal. Where, as here, the witness herself never refuses to testify, the nexus between the error and the loss of her testimony to the defendant is inevitably attenuated and the substantiality of the harm attributable to the error less than "manifest." [24] While

on balance, if it had been objected to at trial, we might have concluded that the misinformation constituted harmful and reversible error, under this scenario we cannot find that it meets the significantly higher standard required for plain error.

In sum, the error was "plain" to no one at trial and had not been ruled on previously by this court; it also involved the interpretation of a relatively recent federal rule, rather than a well-established constitutional or common law right. More important, however, is the lack of a direct nexus between the judge's and prosecutor's remarks and Blackwell's loss of Robinson's testimony. On balance, despite the violation of Rule 11 and the sixth amendment interest implicated, we find no plain error sufficient to require reversal of the conviction.

*Affirmed.*

SPOTTSWOOD W. ROBINSON, III, Chief Judge, concurring:

I join in Parts I and II(A) of the court's opinion, and in the result reached by the court in Part II(B). In my view, the court's analysis in the latter part does not utilize sufficiently an element vitally important in determining whether trial-court proceedings reveal "plain error." I thus feel constrained to add my thoughts on that subject.

In bargaining and proceedings ancillary to the case at bar, the prosecutor agreed to dismiss the gun charge against Robinson in exchange for her guilty plea to another charge and the judge accepted Robinson's forthcoming plea. During Blackwell's trial, however, both the judge and the prosecutor

---

**24.** *Cf. United States v. Pardo*, 636 F.2d at 541–42 (defendants who stood silent when the trial judge asked if they planned to call a witness could not raise as error on appeal the court's recognition of the witness' privilege); *Wilkes v. United States*, 419 F.2d 684, 685–86 (D.C.Cir. 1969) (defendant who raised no objection at the time the prosecutor announced the witness would not testify could not then assign as error on appeal the court's failure to make the witness personally assert the privilege). *But see United States v. Bertone*, 249 F.2d 156, 161 (3d Cir.1957) (allegations that three of a defendant's witnesses had been either prosecuted by

the government or threatened with deportation for refusing to testify against the defendant and that the government had sent another witness on a tour of the country to prevent his appearance could be raised on appeal though defense counsel apparently made no attempt to call these witnesses); *Berg v. Morris*, 483 F.Supp. 179, 184 (E.D.Cal.1980) (defendant who claimed that trial court had impermissibly interfered with his right to present a defense by coercing the witness into giving certain testimony was not required to establish direct or exclusive causation between the judge's action and the testimony given).

indicated plainly that the gun charge might not and probably would not be dropped if Robinson testified that she, not Blackwell, had brought the weapons into the motel room in which they were seized.[1] Blackwell, arguably influenced by these statements,[2] then decided not to call Robinson as a defense witness, but did not in any way claim possible violation of his constitutional right to present witnesses in his defense. I agree that he thus cannot press this claim on appeal unless the statements constituted "plain error" within the meaning of Federal Criminal Rule 52(b).[3]

Recognizing that the plain error rule should be invoked only in exceptional circumstances,[4] the court today finds it inapplicable primarily because (a) the issue portended has yet to be resolved by any federal court, (b) none of the trial participants spotted the problem, and (c) Blackwell has not demonstrated a clear causal connection between his decision not to call Robinson and the purported misinformation communicated to him by the judge and the prosecutor with respect to dismissal of the gun charge against Robinson.[5] While these grounds might furnish acceptable support for the court's finding that the proceedings under review do not reveal plain error, I believe there is another buttressing factor that merits treatment at some length.

It is an elemental and well-settled proposition that courts will not consider an issue first raised on a criminal appeal when the record is incomplete or lacks sufficient data to ensure sound resolution of the issue.[6] To do otherwise would not only undermine the fundamental interest in accurate decisionmaking but would also unfairly penalize the Government, which in such circumstances has no meaningful opportunity to augment the record favorably to its cause.

This principle obviously applies here, for Blackwell neglected at trial to raise the constitutional claim he now would have us entertain, and thereby effectively deprived the Government of a chance to assemble and present evidence relevant thereto. In light of the incomplete record resulting, then, we must decline to examine Blackwell's constitutional claim on its merits.[7] The Government's ability to formulate and articulate a persuasive legal argument in opposition to Blackwell's proposed construction and application of the Sixth Amendment may have been handicapped significantly by absence of occasion to amplify the record on this point. Moreover, this record deficiency interposes substantial obstacles to sound judicial decisionmaking.[8] Not only have any impediments to the Government's

1. See Trial Transcript (Tr.) 63, 129–130, 133, 226–228, 261, 263.

2. See Tr. 265-267.

3. Fed.R.Crim.P. 52(b).

4. See Majority Opinion (Maj. Op.), text at note 23.

5. *Id.* at 34–37.

6. See *Washington v. United States,* 134 U.S. App.D.C. 223, 225–226, 414 F.2d 1119, 1121–1122 (1969); *United States v. Easter,* 539 F.2d 663, 665 (8th Cir.1976); *Robinson v. United States,* 327 F.2d 618, 623 (8th Cir.1964); *Spahr v. United States,* 409 F.2d 1303, 1306 (9th Cir.), *cert. denied,* 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91 (1969); *United States v. Lepinski,* 460 F.2d 234, 239 (10th Cir.1972).

7. Fed.R.Crim.P. 52(b) provides that the court may "notice" error if it is plain and affects substantial rights. My colleagues find that the statements by the judge and the prosecutor do not amount to plain error, but they nevertheless seem to "notice" the statements as error when they determine that the judge went amiss by informing Robinson that the weapons charge likely would not be dismissed if Robinson testified to possession of the weapons. This, I submit, is not entirely faithful to the textual dictates of Rule 52(b).

8. See generally *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347, 1351 (1948) (refusing to address important legal question because, "[w]hile we might be able, on the present [inadequate] record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide"); *Lee v. Habib,* 137 U.S.App.D.C. 403, 409, 424 F.2d 891, 897 (1970) ("[t]here can never be effective appellate review if the reviewing court is not able to obtain a clear picture of the precise nature of the alleged errors in the court below").

capacity to counter Blackwell's constitutional arguments deprived us of the full benefits of the adversary process, but the inadequacy of the record obscures the factual contours of the problem and blurs perception of its legal ramifications. Indeed, a well-developed record is essential to decision of any question, especially one constitutional and novel in character, and the defective record we now have leaves open the possibility that factors relevant to resolution of the constitutional issue may escape judicial attention.[9] Accordingly, I think there are good reasons to adhere in this case to traditional doctrine militating against a finding of plain error on a materially incomplete record.

Additionally, even if the court's disposition of Blackwell's newly-raised constitutional objection[10] reflects proper limits on judicial power to rescind acceptance of a plea bargain, we cannot be certain that the Government would not prevail under this interpretation if afforded the opportunity to adduce further evidence. The court acknowledges that the Government would defeat Blackwell's claim if it can show that Robinson engaged in fraudulent or deceitful conduct during the plea discussions.[1]

---

**9.** Independently of Rule 52(b), courts traditionally have refused to decide constitutional questions on an incomplete or inadequate record. See *Kleppe v. New Mexico,* 426 U.S. 529, 546, 96 S.Ct. 2285, 2295, 49 L.Ed.2d 34, 47–48 (1976) (holding that courts should not decide important constitutional questions on less than an " 'adequate and full-bodied record' ") (quoting *Public Affairs Assocs. v. Rickover,* 369 U.S. 111, 113, 82 S.Ct. 580, 582, 7 L.Ed.2d 604, 607 (1962)); *Tennessee Publishing Co. v. American Nat'l Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13, 15 (1936) ("[i]t is a familiar rule that the court will not anticipate the decision of a constitutional question upon a record which does not appropriately present it"). See also *Wheeler v. Barrera,* 417 U.S. 402, 426–427, 94 S.Ct. 2274, 2288, 41 L.Ed.2d 159, 178 (1974); *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461–462, 65 S.Ct. 1384, 1389–1390, 89 L.Ed. 1725, 1734–1735 (1945); *Allen-Bradley Local 1111, United Elec. Workers v. Wisconsin Employment Relations Bd.,* 315 U.S. 740, 746, 62 S.Ct. 820, 824, 86 L.Ed. 1154, 1163 (1942); *Wilshire Oil Co. v. United States,* 295 U.S. 100, 102–103, 55 S.Ct. 673, 674, 79 L.Ed. 1329, 1331 (1935); *Bandini Petroleum Co. v. Superior Court,* 284 U.S. 8, 22, 52 S.Ct. 103, 108, 76 L.Ed. 136, 145 (1931). See generally *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588 & n. 2, 92 S.Ct. 1716, 1719 & n. 2, 32 L.Ed.2d 317, 322 & n. 2 (1972) (court should not decide constitutional question unless the question is "presented with the clarity needed for effective adjudication"); *Rescue Army v. Municipal Court,* 331 U.S. 549, 584, 67 S.Ct. 1409, 1427, 91 L.Ed. 1666, 1686 (1947) (court should not decide constitutional question unless the question is presented in "clean-cut and concrete form"); *Associated Press v. NLRB,* 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953, 960 (1937) (court will not resolve constitutional question on basis of hypothetical facts). Additionally, courts frequently have adverted to the longstanding precept that they should not formulate rules of constitutional law broader than required by the facts. *E.g., Kremens v. Bartley,* 431 U.S. 119, 136–137, 97 S.Ct. 1709, 1719, 52 L.Ed.2d 184, 197 (1977); *Alabama State Fed'n of Labor v. McAdory, supra,* 325 U.S. at 461–462, 65 S.Ct. at 1389–1390, 89 L.Ed. at 1734–1735; *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688, 711 (1936) (Brandeis, J., concurring); *Liverpool, N.Y. & Phil. S.S. Co. v. Commissioners of Emigration,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899, 901 (1885). It would seem a logical outgrowth of these holdings that when, as here, the record is materially deficient, the court should not undertake any constitutional pronouncement at all, as its knowledge of relevant facts is limited at best. Indeed, we would depart from the deference historically extended to the importance and delicacy of constitutional adjudication, see *Kremens v. Bartley, supra,* 431 U.S. at 127–128, 97 S.Ct. at 1714, 52 L.Ed.2d at 192; *Wheeler v. Barrera, supra,* 417 U.S. at 426, 94 S.Ct. at 2288, 41 L.Ed.2d at 178; *Ashwander v. TVA, supra,* 297 U.S. at 345, 56 S.Ct. at 482, 80 L.Ed. at 710 (Brandeis, J., concurring), were we to decide Blackwell's belatedly-posed, novel issue of constitutional law on the seriously incomplete record before us.

**10.** See Maj. Op., text at notes 13–20. The court today concludes on statutory grounds that the judge's statements demonstrate misapprehension of the limitations on her power to rescind judicial acceptance of a plea agreement. The court does not, however, unequivocally hold that the statements violated Blackwell's Sixth Amendment rights, though it says that they "probably" did. *Id.,* text at note 23. Because, for lack of plain error, we need not reach these questions, I express no opinion as to their proper resolution.

**11.** *Id.,* text at note 18 & note 18. The scope of this exception, if it exists at all, is as yet ill-defined, and may ultimately prove broad enough to include various misrepresentations by a defendant to the Government. If so, this

While we have no proof of such conduct, we also lack proof that it did not occur; the record simply does not address this point directly. Because this silence is attributable to Blackwell, and because the Government might have been able to produce evidence of such conduct if provided the chance to do so,[12] we cannot properly conclude that the District Court committed error, much less plain error, in this case.

The court recognizes that Blackwell's failure to present his constitutional claim to the District Court robbed the Government of an opportunity to prove fraud,[13] but it does not seem fully to appreciate the import of this circumstance, as it nevertheless determines that the judge ultimately lacked power to rescind her acceptance of the plea agreement in this case,[14] which necessarily implies that the court also has made the factual determination that no fraud occurred here. This latter conclusion, I sub-

mit, is entirely bereft of any factual basis in the record. Nor could it be justified by holding the Government responsible for the absence of evidence on the point, for, as the court acknowledges, the constitutional question to which such evidence bears relevance was not tendered by Blackwell. Indeed, Blackwell barely managed to raise on appeal the question whether the statements by the judge and the prosecutor revealed their misapprehension of the Government's and the District Court's obligation to adhere to the plea agreement; the only reference to it that I can discover is a single sentence in his brief.[15] Moreover, as the court's opinion today apparently is the first decision by a federal court that attempts in any way to explicate the law on this subject, the Government could not heretofore even have been confident that any exception for fraud or deceit would be available. In short, it seems to me that the Govern-

increases the likelihood that the Government would have been able, had it been given the chance, to introduce evidence showing that Blackwell's Sixth Amendment rights were not infringed.

**12.** The record suggests that this possibility might not be academic. When confronted with Robinson's readiness to waive her privilege against self-incrimination by testifying for Blackwell—perhaps to say that she had brought the seized weapons into the motel room, see Tr. at 127—the judge and the prosecutor raised the specter of perjury and questioned the voluntariness of the waiver, *id.* at 127–130. This behavior might indicate awareness of earlier representations by Robinson that she had not transported the weapons. Of course, we cannot know whether these representations occurred or, if so, whether they would have justified the Government reneging on its agreement to dismiss the gun charge against Robinson had she testified to possession of the weapons. But the fact that the judge and the prosecutor acted in a manner consistent with the existence of such representations should only bolster our resolve not to prejudge the merits of the issue adversely to the Government on an incomplete record for which Blackwell is responsible.

**13.** See Maj. Op. at 1342.

**14.** See *id.,* text at notes 13–20. My colleagues seek to defend their holding, that the judge erred when she stated that the gun charge probably would not be dismissed if Robinson testified to possession of the weapons, in part

on the ground that courts often decide whether the trial court committed error before they reach the question whether the error was plain within the contemplation of Rule 52(b). See *id.* at note 22. Of the cases cited in purported support of this proposition, however, none involves, as does the case at bar, a materially deficient or incomplete record; accordingly, none constitutes relevant authority in support of my colleagues' decision to reach the statutory question implicated by Blackwell's constitutional claim. I would emphasize that the cynosure of my position is not, as my colleagues apparently misapprehend, see *id.,* merely that the Government has had no opportunity to respond to Blackwell's Sixth Amendment claim at trial; it is, rather that this deprivation has created a seriously inadequate record, upon which any determination by this court that the judge misconceived her power to abrogate acceptance of Robinson's plea would be premature, unfounded, and in violation of Rule 52(b). The inappropriateness of any decision on the merits of Blackwell's untimely claim, moreover, is indeed heightened with respect to the larger constitutional issue that my colleagues do not resolve, for traditional principles of federal jurisprudence reinforce the requirement of Rule 52(b) that we not decide constitutional questions on a seriously flawed record. It is for these reasons that I concur in the court's holding that the statements by the judge and the prosecutor do not constitute plain error.

**15.** See Brief for Appellant at 15–16.

ment has hardly been apprised of the relevance of fraud, much less afforded any sort of meaningful opportunity to pursue the circumstances of Robinson's plea bargain. Any suggestion or factual determination by this court that Robinson did not engage in fraudulent or deceitful conduct is both premature and unfounded, and we thus should not prejudge the merits of the fraud question adversely to the Government on a record made barren by Blackwell's own failure to register his objection seasonably.[16]

So, even if the court's partial resolution of the constitutional issue belatedly advanced by Blackwell is a correct explication of the law, there remains the insuperable obstacle that the record on appeal does not afford an adequate foundation upon which to determine whether the remarks of the judge and the prosecutor in this case bred error of any sort. Much less, then, is there basis for holding that the District Court proceedings disclose the "miscarriage of justice" required by the Supreme Court for a finding of plain error within the terms of Rule 52(b).[17]

---

**16.** See *Price v. Johnson,* 334 U.S. 266, 291, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356, 1372 (1948) ("[a]ppellate courts cannot make factual determinations which may be decisive of vital rights where the crucial facts have not been developed"); *Brown v. Collins,* 131 U.S.App.D.C. 68, 72, 402 F.2d 209, 213 (1968) ("[w]here the record shows no reference to the legal claim, the facts must be unambiguous before an appellate determination cutting off or requiring retrial is proper").

**17.** See *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982).