**UNITED STATES of America, Appellee,**

v.

**Anthony C. RHODES, a/k/a Adedayo Odumowo, Appellant.**

**No. 88–3087.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 12, 1989.

Decided Sept. 22, 1989.

As Amended Sept. 22, 1989.

**376**

Gary S. Marx (appointed by the Court) for appellant.

Jay B. Stephens, U.S. Atty., with whom Michael W. Farrell, Washington, D.C., John P. Dominguez, and Rachel Adelman–Pierson, Asst. U.S. Attys., were on the brief for appellee.

Before MIKVA and WILLIAMS, Circuit Judges, and WILL,* Senior District Judge.

Opinion for the Court filed by Senior District Judge WILL.

HUBERT L. WILL, Senior District Judge:

This is an appeal from a conviction for bank fraud in violation of 18 U.S.C. § 1344 (1982), forgery in violation of D.C.Code § 22–3841 and use of a false social security number in violation of 42 U.S.C. § 408(g)(2) in presenting a fraudulent check for pay-

---

* The Honorable Hubert L. Will of the United States District Court for the Northern District of

ment and using a false social security number to open two bank accounts.

### I. FACTUAL BACKGROUND

The appellant is a Nigerian citizen who has been residing in the United States since November 1979. His Nigerian name is Adedayo Odumowo, but he has used the English name of Anthony C. Rhodes since he has been in the United States. Rhodes testified that he was in the business of cashing checks in the United States for resident citizens of Nigeria who presented those checks to him or an associate for payment at a discounted rate. This process helped Nigerian residents to avoid the delays and difficulties in getting currency there. At times, the funds received by Mr. Rhodes were used to buy goods in the United States for resale in Nigeria.

Rhodes had savings and checking accounts at First American Bank in the District of Columbia which he used for cashing checks given him by Nigerians. He opened those accounts by presenting a D.C. driver's license bearing a false social security number, first on November 5, 1987 in order to open the savings account, then on December 2 to open the checking account. Mr. Rhodes testified that in order to protect himself, he would deposit a Nigerian check and would wait for it to clear before authorizing his Nigerian associate to pay for the check.

Rhodes testified that some time in the summer of 1987, Ayiola Wahab asked him to cash a check which was endorsed to Balarabe Abdullahi and which included no restrictions. Rhodes deposited the check in First American Bank, he was told that the check had cleared, his associate paid Wahab in Nigerian currency and Rhodes used the United States currency to purchase goods for export to Nigeria. Rhodes further testified that in November 1987, Mr. Wahab contacted his associate in Nigeria about purchasing a second check. Rhodes purchased the check, which was endorsed to Joshua Osakwe, and deposited it in his savings account on December 2, 1987 (the same day on which he opened the checking

Illinois, Eastern Division, is sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

account). Also on December 2, Rhodes transferred $15,000 from his savings account to his checking account. Rhodes testified that after the check had cleared (i.e., the bank made the funds available for his use), he paid Mr. Wahab $5,000 towards the full $20,000 owed to him.

On December 8, Rhodes came to First American Bank to buy traveler's checks. He wrote a check on his account for $5700, discovered that the bank did not have large denominations of American Express traveler's checks, and then asked that the check be certified. However, when he attempted to buy traveler's checks at the American Express office, he was told that he would have to have a cashier's check. Transcript ("Tr.") 3/30, at 138.

On December 9, when Rhodes again went to the bank to exchange the certified check for a cashier's check, he was arrested by Metropolitan Police Officer Walter Dandridge. Dandridge was in the area investigating another matter when bank personnel, who had discovered that the check given them by Rhodes was fraudulent, knocked on the window of his car and asked for aid. Dandridge and his partner, Sergeant McBain, approached Rhodes and, without giving him *Miranda* warnings, asked him to go with them to a conference room for questioning. The door to the conference room was open during the fifteen to twenty minutes of questioning, but the evidence showed that Rhodes would not have been allowed to leave the room. In addition to Rhodes, McBain, and Dandridge, a bank security officer, Arthur Smith, was in the conference room, and McBain, Dandridge and Smith each asked questions. However, Dandridge testified at trial that not everyone was in the room at once and that he left the room during some of the questioning to make a phone call.

After Rhodes testified at trial that he had received the fraudulent check from Wahab, Dandridge testified in rebuttal that in the bank conference room Rhodes told him that the check came from an uncle in Kansas. Smith testified in rebuttal that he asked Rhodes where the check came from

while both McBain and Dandridge were out of the room and Rhodes responded that the check came from his uncle in Nigeria and pointed to the name on the check, Joshua Osakwe & Co., Ltd., P.O. Box 5001, Lagos, Nigeria.

Rhodes was charked in a four-count indictment with (1) intending to devise a scheme and artifice to defraud a federally chartered and insured bank to obtain money by means of false and fraudulent pretenses by depositing a check knowing it to be falsely made, transferring funds from his savings to his checking account, obtaining a certified check and attempting to cash the check, in violation of 18 U.S.C. § 1344; (2) knowingly presenting as genuine a false check with intent to defraud in violation of D.C.Code §§ 22–3841 and 3842(a); and (3)–(4) knowingly and intentionally representing a false social security number to be his own on November 5, 1987 and on December 2, 1987 in violation of 42 U.S.C. § 408(g)(2). The jury found Rhodes guilty on all four counts, and he was sentenced to two sixteen-month terms to run concurrently for the federal offenses (defrauding a bank and using a false social security number) and a two to six-year term for the D.C.Code forgery violation to run consecutively to the sixteen-month term. This appeal followed.

## II. ANALYSIS.

### A. *Admissibility of Rhodes' Statements.*

Rhodes argues first that the statements he made to Smith and Dandridge during their questioning of him at the bank should have been excluded because they were made without the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and were untrustworthy.

Since the statements were made without the benefit of *Miranda* warnings, the government did not offer them in its case in chief but used them in rebuttal to impeach Rhodes' credibility. In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Court held that such statements could be used, as they were

here, to impeach the credibility of the defendant who has taken the stand "provided of course that the trustworthiness of the evidence satisfies the legal standards." *Id.* at 224, 91 S.Ct. at 645; *see also United States v. Hinckley*, 672 F.2d 115, 133 n. 117 (D.C.Cir.1982). Rhodes argues that because there was confusion about what he actually said, the statements are so untrustworthy that they should have been excluded. In addition, he argues that the *Harris* holding was based on weighing the policy of deterring police misconduct against that of preventing perjury. Such a balancing, he alleges, would lead us to a different conclusion in this case in which the evidence of perjury was not as great as in *Harris.*

We note that neither the *Harris* decision nor any other that we know of has required a trial court to conduct such a balancing. In fact, the *Harris* Court wrote that "sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Id.* 401 U.S. at 222, 91 S.Ct. at 644; *see also Oregon v. Hass*, 420 U.S. 714, 722, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570 (1975). The *Harris* holding does not prevent the government from using in rebuttal statements made without *Miranda* warnings, even if the evidence of perjury is thin.

Turning to the question of the trustworthiness of Rhodes' alleged statements, we find that the statements satisfy legal standards. Rhodes relies on the statements of Smith, the bank security officer, that he had a very hard time understanding Rhodes. Tr. 3/31, at 80–81. Nevertheless, as the government points out, Smith never indicated that he was unable, in spite of the admitted difficulty, to understand Rhodes or that he was uncertain about Rhodes' responses to questions. Rhodes also argues that "Officer Dandridge's testimony indicated difficulty," Brief of Defendant–Appellant at 10, but relies on two places in Dandridge's testimony in which he only indicated that he could not remember verbatim everything that Rhodes had said. Finally, he notes that the trial judge remarked on a language difficulty, Tr. 3/30,

at 126, but the judge did not indicate that such a difficulty led to unreliability.

A final piece of evidence Rhodes uses to show confusion is the fact that Smith and Dandridge gave two different stories about what he had said when asked about where the check came from. However, those two stories were the two different responses which Dandridge and Smith said that they were given by Rhodes when they separately questioned him. It is possible, of course, that Dandridge heard "Kansas" when Rhodes said "Lagos."

We cannot conclude, especially in light of our deference to the trial judge on questions of the admissibility of evidence, *United States v. Gorel*, 622 F.2d 100, 105 (5th Cir.1979), *cert. denied*, 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980), that Rhodes' alleged statements were so untrustworthy that it was error to admit them. Rhodes' final argument that Fed.R. Evid. 403 required the exclusion of these prejudicial statements has no merit for the reasons noted above.

### B. *Evidence of Other Checks Unrelated to Rhodes.*

■ We turn to an issue which came up in oral argument, though neither raised before the district court nor in the briefs submitted to us, the issue of whether evidence about certain fraudulent checks which were in no way connected to Rhodes were erroneously admitted at trial. The government introduced three checks which, like the fraudulent check presented by Rhodes, were written on a non-existent Wilch Manufacturing Inc. account at Citibank, N.A. Tr. 3/30, at 46–48; Exs. 36, 37 and 38. In addition, those checks had the same transit code found on the one transferred by Rhodes, and were each written to a different party in Lagos, Nigeria. The government elicited testimony that Citibank had experienced a loss on the payment of two of the checks. Nevertheless, at trial and at oral argument before us, the government conceded that there was no evidence connecting those checks to Mr. Rhodes.

Later in the trial, the government produced and introduced into evidence Exhibit 40, which is a copy of a genuine check issued by Northwestern University on an account at State National Bank of Evanston, Illinois to Baystark Press of Lagos, Nigeria. That check had the same routing code found on the check deposited by Rhodes (as well as Exhibits 36–38) and was a check which was never presented through the system for payment. Tr. 3/30, at 59. In addition, the government produced Exhibit 41, a fraudulent check with the same routing code as Exhibit 40, which conformed even more closely to Exhibit 40 (the check to Baystar Press) than did Exhibits 36–38 (the fraudulent checks written on the non-existent Wilch account at Citibank), differing only in that it purported to be written on the account of the Bisser Company, Alpino, Michigan to be paid to Onawell Industries, Lagos, Nigeria. Finally, there was testimony that six or seven other fraudulent checks with the same transit number were received by State National Bank of Evanston and that all payors were Nigerian companies. Tr. 3/30, at 60–61. Again the government admits that there was no evidence connecting Rhodes to any of those checks.

Rhodes' trial counsel did not object to the introduction of these checks into evidence, so we must consider their introduction under a plain error standard. *United States v. Bass,* 535 F.2d 110, 116 (D.C.Cir.1976). Federal Rule of Criminal Procedure 52(b) allow us to take notice of "[p]lain errors or defects affecting substantial rights ... although they were not brought to the attention of the court." However, this rule only applies to "particularly egregious errors,'" which "'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations omitted). We have written that the rule should be invoked "when the weakness of the evidence against defendant indicates that a serious injustice was done." *United States v. Baker,* 693 F.2d 183, 187 (D.C.Cir.1982).

■ We consider as well that this error was not raised or briefed by Rhodes' appellate counsel and that some courts have found waiver in similar circumstances. *See, e.g., United States v. Burroughs,* 650 F.2d 595, 598 (5th Cir.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981); *United States v. John Bernard Indus., Inc.,* 589 F.2d 1353, 1362 n. 5 (8th Cir.1979). However, we follow the lead of the court in *United States v. Greschner,* 802 F.2d 373, 380 (10th Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987), which indicated that even though an issue was not raised either at trial or on appeal, the issue would not be deemed waived had it been "a case of plain error in which we should reverse on our own motion." If the error in this case is one which affects substantial rights and seriously affects the fairness of the judicial proceedings, then we should reverse Rhodes' conviction on our own motion. In order to determine whether the introduction of checks unrelated to Rhodes was plain error, we must consider its effect against the background of the entire record, considering both the way the evidence was presented to the jury and the sufficiency of the other evidence in support of the conviction. *Young,* 470 U.S. at 16–20, 105 S.Ct. at 1046–48; *United States v. Tarantino,* 846 F.2d 1384, 1403 (D.C. Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988).

We considered in *United States v. Blackwell,* 694 F.2d 1325 (D.C.Cir.1982), whether or not it was plain error for a trial judge incorrectly to state that a defense witness's dismissed gun charge could be reinstated based on her testimony in Blackwell's case even though she had entered into a binding plea agreement with the government. After the judge's statement, Blackwell testified that he would not call the witness. Nevertheless, Blackwell's counsel did not object to the judge's incorrect statement of the law, which might have prejudiced Blackwell's Sixth Amendment right to present witnesses in his defense.

On review of this case for plain error, we noted first "that neglected error must rise to a level far above that required to survive

Rule 52(a)'s ban against reversals for harmless error." *Id.* at 1341. In other words, the error must be more than non-harmless. Our plain error analysis involved considering the substantiality of the right affected, the novelty of the legal issue on which the trial court allegedly erred and the acts taken by the defendant which resulted in the abandonment of his right. *Id.* at 1341–43. We found that the importance of the right favored a finding of plain error, but that "the lack of prior precedent in the circuit and the novelty of the issue presented militate[d] against calling the judge's mistake plain error." *Id.* at 1342. In addition, we found that the defendant himself abandoned his right to call the witness, even though the reason he gave was his concern about renewed prosecution of the witness. Although we acknowledged that the case was a "close one," *id.* at 1340, we found no plain error because "the error was 'plain' to no one at trial" and there was no "direct nexus between the judge's and prosecutor's remarks and Blackwell's loss of [his witness'] testimony." *Id.* at 1343.

In contrast to *Blackwell*, the error of introducing the check evidence in the present case should have been plain, since the ban on prior bad act evidence in order to show a defendant's bad character is a well-established rule of evidence. In addition, Rule 403's exclusion of non-probative prejudicial evidence is firmly established. Secondly, the substantiality of the right at issue in the present case is very high because of the degree of prejudice caused by the introduction of the check evidence, the weakness of the government's other evidence and the lack of any corrective instruction to mitigate the effect of the evidence. *See United States v. Hernandez*, 780 F.2d 113, 119 (D.C.Cir.1986) (citing factors to consider under harmless error analysis). Finally, in contrast to *Blackwell*, there was a direct nexus between the error of introducing the check evidence and the prejudicial effect which resulted. Although Rhodes failed to object at trial, unlike Blackwell he did nothing else to show that he was abandoning his right to a fair trial.

Even if the evidence could have come in for a permissible purpose pursuant to Rule 404(b), it could not have met the requirement of Rule 403 that its probativeness exceed its prejudicial effect. *See United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir.1980) (bad acts evidence which is admissible under 404(b) may, nevertheless, be excluded under 403). Evidence, such as that admitted in the present case, cannot possibly be probative when the government has failed to meet its burden of proving the involvement of the defendant in the alleged prior bad act. *Hernandez*, 780 F.2d at 118–19 (evidence that a defendant was merely present and shouting while others engaged in a fight did not constitute participation and was, therefore, insufficiently probative for admission). *See also Warner v. Transamerica Ins. Co.*, 739 F.2d 1347, 1350–51 (8th Cir.1984) (evidence of prior fire was correctly excluded as nonprobative, since there was no proof that the insured had caused the prior fire nor that anything about it showed his familiarity with insurance claims and recovery).

In the present case, the probativeness of the check evidence was even lower than in *Hernandez*. The government stated at trial that it "will concede it doesn't intend to argue that this defendant negotiated Exhibits 36, 37 and 38," (Tr. 3/30 at 192), but it nevertheless insinuated at trial that Rhodes and his associate in Nigeria were connected to this other fraudulent check activity even though there was no evidence of such a connection. On cross-examination of Mr. Rhodes by the government, the following interchange took place before the jury:

Government: You heard testimony that these, that these which Wilch Manufacturing checks drawn on Citibank, just like that in Defense Exhibit No. 1, with the same identical transit number, were popping up all over the United States, and one in Netherlands. You heard that, correct?

Rhodes: Yes, I did hear that.

Government: Yes, and they all had the same thing in common: not only the transit number and the Wilch logo and

address and at the Citibank, but they also had the Lagos, Nigeria, connection; is that right? Did you hear that?

Rhodes: You have lost me. Would you say that again?

*Id.* at 165. The government capitalized in closing argument on the fact that "there were a lot more of those kinds of checks floating around, all with ties to Nigeria,...." Tr. 3/31 at 97. Also in closing argument, the government attempted to connect Rhodes' testimony about his Nigerian associate in his check-buying business to these fraudulent Nigerian checks. *Id.* at 97–98. In spite of the government's insinuations, those checks were not probative with regard to any element of proof in the case against Rhodes.

However, the checks were highly prejudicial, because they may have misled the jury into believing, based on the evidence of other fraudulent checks written to Nigerians, that Rhodes was part of a Nigerian scheme or that he at least must have shown that the check he transferred was fraudulent. Any connection with numerous other Nigerian fraudulent checks would tend to undermine Rhodes' defense that he lacked knowledge that the check was bad. The only contested element of the forgery and fraud counts was Rhodes' state of mind, so the check evidence related to the central issue of his case and may have been crucial to the outcome of his case.

Title 18, section 1344 provides in relevant part:

(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a federally chartered or insured financial institution; or

(2) to obtain any of the moneys, ... under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, ... shall be fined not more than $10,000, or imprisoned not more than five years, or both.

Rhodes did not contest that he had passed the fraudulent check or try to show that the check was genuine. Nor did he contest

that he had committed any of the acts which allegedly added up to a fraudulent scheme to defraud. And, in fact, none of those acts were, in themselves, illegal. It was Rhodes' knowledge of the falsity of the check which was the central issue as to Count 1. On this issue, the erroneous introduction of other fraudulent checks to which Rhodes had no connection was highly prejudicial.

The D.C.Code forgery statute provides in relevant part:

(b) A person commits the offense of forgery if that person makes, draws, or utters a forged written instrument with intent to defraud or injure another.

D.C.Code § 22–3841(b). "Utter" is defined in the statute as "to issue, authenticate, transfer, publish, sell, deliver, transmit, present, display, use, or certify." *Id.* at 3841(a). The government charged, and the jury convicted Rhodes for knowingly *presenting* a false check *with intent to defraud.* Again, Rhodes did not contest that he had presented a false check, but only contested that he did it with an intent to defraud. Rhodes' state of mind was, therefore, also central to Count 2.

We turn to the sufficiency of the other evidence presented by the government to show that Rhodes had acted with knowledge and intent to defraud and find that the evidence is not strong. Of course, "fraudulent intent may be established by circumstantial evidence and by inferences deduced from facts and situations." *United States v. Bales,* 813 F.2d 1289, 1294 (4th Cir.1987). The government relied on the series of circumstances—the opening of the savings account using a false social security number, Rhodes' use of two different addresses on his checking and savings accounts, the failure of Rhodes to use his Nigerian name on the account, the short period of time which passed before Rhodes presented the fraudulent check, and the fact that Rhodes moved $15,000 of the funds from the savings account to his checking account—to show Rhodes' state of mind. Tr. 3/30, at 116; Tr. 3/31, at 92–101. None of these circumstances, however, were in themselves sufficient to

show Rhodes' guilty state of mind nor does their combination show very conclusively that Rhodes was up to anything suspicious.

The government also presented evidence that the private endorsement of a check payable to a corporate party (such as the one received by Rhodes) was a sign that the check was not genuine. However, the evidence showed that a *layperson*, such as Rhodes, would not normally have known that the check Rhodes received was fraudulent. Tr. 3/30, at 51. In addition to this evidence in its case in chief, the government relied on Officers Dandridge and Smith to impeach Rhodes' credibility. They testified that Rhodes had stated at the time he was arrested that the check came from his uncle (rather than from Wahib, as he had testified at trial).

Based on the impeachment evidence and the other circumstantial evidence, including the evidence of and reference to many other fraudulent checks unrelated to Rhodes, the jury apparently chose to disbelieve his testimony that he did not know the check was a forgery and did not intend to defraud the bank. The jury concluded that Rhodes *did* know the check was false and, therefore, intended to defraud the bank. We can easily conclude that the error was not harmless, since this evidence is not "so overwhelming that 'we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Henry*, 528 F.2d 661, 668 (D.C.Cir.1976) (citations omitted).

However, we also find pursuant to the analysis relied on in *Blackwell* that plain error has occurred in the case before us. The substantiality of the right and of the error which occurred are very high because of the prejudicial way in which the government used the evidence, its utter lack of probativeness, its centrality to the government's case and the weakness of the other evidence as to Rhodes' knowledge. In addition, the introduction of prior bad acts (and in this case non-probative) evidence is an error that is plain to a judge and counsel in most cases so that its introduction here

is "inconsistent with the fairness and integrity of judicial proceedings...." *Blackwell*, 694 F.2d at 1341 (quoting 3A C. Wright, *Federal Practice and Procedure: Criminal 2d* § 856 at 341).

The plain error of introducing the four fraudulent checks as well as the testimony about the passing of six or seven other fraudulent checks, none of which were connected to Rhodes, and the prosecutor's reference in closing argument to "a lot more of those kind of checks floating around" affected his substantial rights and seriously affected the fairness of the trial. We have found that the introduction of prior bad acts evidence without an instruction informing the jury of its limited purposes constituted plain error. *United States v. McClain*, 440 F.2d 241 (D.C.Cir.1971). As the necessity of such an instruction was found to be plain in *McClain* even though counsel did not specifically request it, the introduction of the check evidence in the present case was also plain error.

This evidence, especially as used by the government, could have led and, since it had no other probative value, was apparently intended by the government to lead the jury to believe that Rhodes was part of a major scheme by Nigerians to pass fraudulent checks, when there was, in fact, no evidence of such a scheme or his participation in any such scheme. As a result, the jury may well have been prejudiced in favor of the government's position that Rhodes acted with knowledge and intent to defraud in violation of 18 U.S.C. § 1344 and D.C.Code § 22–3841. We, therefore, reverse Rhodes' conviction as to Counts 1 and 2.

■ However, with regard to Counts 3 and 4, the convictions for twice using a false social security number in violation of 42 U.S.C. § 408(g)(2), we conclude that the jury's judgment could not have been substantially swayed by the erroneous introduction of the other check evidence, since the evidence of use of a false social security number did not depend on Rhodes' knowledge about the validity or invalidity of the check. Since we find that the error was harmless as to Counts 3 and 4, it

cannot possibly meet the plain error standard, so his conviction on Counts 3 and 4 stands.

Rhodes has also alleged two errors with regard to his sentencing which we do not here consider, since he must now be either retried or resentenced.

### III. CONCLUSION

Because we find that it was plain error to admit evidence regarding fraudulent checks which were not connected to Rhodes, we reverse his conviction for bank fraud in violation of 18 U.S.C. § 1344 and for forgery in violation of D.C.Code § 22–3841 and affirm his conviction for using a false social security number in violation of 42 U.S.C. § 408(g)(2).