**UNITED STATES of America**

v.

**Leroy MILLER, Appellant.**

**UNITED STATES of America**

v.

**Paul A. MILLER, Appellant.**

**Nos. 88–3144, 88–3152.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 17, 1989.

Decided Feb. 6, 1990.

(Holmes, J., dissenting); *Whitney v. California,* 274 U.S. 357, 372–80, 47 S.Ct. 641, 647–50, 71     L.Ed. 1095 (1927) (Brandeis, J., concurring).

Michael Lasley, appointed by this court, for appellant in No. 88–3144.

Charles B. Wayne, Washington, D.C., appointed by this court, for appellant in No. 88–3152.

Linda L. Mullen, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before HARRY T. EDWARDS, BUCKLEY and STEPHEN F. WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Paul and Leroy Miller, the appellants in this consolidated appeal, were convicted of conspiracy and several substantive offenses arising from a check-forging scheme. On appeal, Paul Miller challenges trial court rulings allowing the Government to elicit testimony from two witnesses concerning his prior criminal conviction. Leroy Miller contests the sufficiency of the evidence underlying his conviction for conspiracy.

We affirm both convictions. We reject Paul Miller's claim that evidence of a defendant's past crimes can never be introduced to show a *witness'* state of mind, and find that the District Court properly admitted the disputed testimony of one witness for this purpose. Although the trial court should have excluded the testimony of the second witness, the admission of this evidence was harmless error. The evidence against Leroy Miller amply supports the jury's verdict.

## I. BACKGROUND

Paul and Leroy Miller were charged in a four-count indictment with conspiracy to commit bank fraud ("Count One"), *see* 18

---

1. Leroy Miller was also charged with forgery and uttering under D.C.Code §§ 22–3841, 22–3842(a) (1981).

2. Paul Miller's counsel told the jury:

    What we ask you, ladies and gentlemen, is to consider who had a scheme here, who profited from this particular—these transactions in the bank, who had access to the checks, who forged the bank officers' names to those checks.

U.S.C. § 371 (1988), and bank fraud, *see* 18 U.S.C. § 1344 (1988).[1] Evidence at trial established that Paul Miller's girlfriend, Myrna Mann, used her position as a secretary at a Washington bank to procure forged checks totalling some $37,000. The Government's theory of the case was that Paul Miller coerced Mann into furnishing the checks, and that both Millers recruited payees to cash the checks in return for a fee. *See* Trial Tr. I at 21–22 (Government's opening statement). The theory of the defense was that Mann, who by the time of the trial had pleaded guilty to embezzlement, devised the check-forging scheme on her own and implicated Paul and Leroy Miller as part of a plea bargain. *See* Trial Tr. I at 26 (Paul Miller's opening statement);[2] *id.* at 28 (Leroy Miller's opening statement). Leroy Miller maintained, in addition, that he was too marginal a participant in the scheme to be convicted for conspiracy. *See id.* at 28 (opening statement).

At two points in the trial, disputes arose over whether the Government would be permitted to introduce evidence of Paul Miller's previous conviction for robbery. The first was when the Government, on the first day of trial, informed the court that it intended to elicit testimony concerning the conviction from Mann. Paul Miller's counsel objected to the proposed testimony as irrelevant and prejudicial; the Government argued that evidence of Mann's awareness of Paul Miller's criminal record was necessary to lend credibility to her claim that she had been coerced into participating in the check-forging scheme. *See* Trial Tr. I at 7–8, 10. The judge ruled that the evidence could be admitted, stating:

Well, I will try to cut the baby in half to the extent that I can. I am going to

You will hear the testimony from the witnesses on the witness stand, and you must determine the credibility of each witness. I ask you to pay particular attention to those witnesses. Pay attention to their motives, their demeanor. Who, in fact, was arrested and cut a deal with the United States Attorney's office to attempt to save herself. These are the matters that we will go into.

Trial Tr. I at 26.

allow her to testify that she was being threatened, and that she knew that Paul Miller had a prior criminal record and had served time, without going into the specific offense.

If the jury doesn't believe on the basis of that that she was threatened, then so be it. But some balance has to be struck here between the defendants' rights and the Government's need to bring that woman in and have her testify.

Now, of course, if on cross-examination doubt is cast on her story as to why was she really afraid or whatever, it may be that you can recall her on redirect or whatever. You may be able then to bring out more. That depends entirely on what happens on cross-examination. But at least on direct all she can say ... [is] that she was threatened, and she felt there was validity to the threat in view of the fact she knew he had a prior criminal record and he had served time.

Trial Tr. I at 10–11. Mann was permitted to testify on this basis.[3]

The issue of Paul Miller's conviction came up again during the testimony of Tracie Barnes. Barnes was a payee on one of the forged checks, and she testified that she agreed to cash the check for Paul Miller in exchange for $2,000—one-fourth of the check's value. See Trial Tr. II at 9–10. After completing direct examination, the Government requested permission to reopen so that it could elicit testimony from Barnes that she had agreed to cash the check because she knew that Paul Miller had recently been released from prison and surmised that he did not have a checking account. See id. at 11–13.[4] Paul Miller's counsel again objected. See id. at 12. The judge responded:

> We've got to know. All this is ridiculous. We have to have some explanation of what went on, why she cashed a check for some total stranger. The jury is entitled to know that.
>
> . . . .
>
> It's already been brought out he was in jail.
>
> . . . .
>
> It's not prejudicial at all if it was already brought out. It seems to me the jury is entitled to know why a total stranger would go and handle a cashier's check.

Id. at 12, 13. During a five-minute recess, the prosecutor explained to Barnes that she could testify only that Paul Miller had a criminal record but could say nothing about the nature of the offense for which he had been convicted; the Government was then permitted to elicit the disputed testimony.[5]

The jury ultimately returned guilty verdicts against both appellants on all counts, and this appeal ensued.[6] Paul Miller continues to challenge the admission of the evidence pertaining to his prior conviction. Leroy Miller argues that the evidence at trial was insufficient to sustain a conviction for the conspiracy charged in Count One.

---

**3.** Mann testified that shortly after Paul Miller and she began their relationship, Miller "told me that he had just gotten out of prison from a previous offense that he had committed. When he told me that, it was like a shock. So I didn't want to continue just talking to him and just casually seeing him like I was." Trial Tr. I at 38.

**4.** The judge actually precipitated the Government's request when, upon the conclusion of the Government's direct examination, he asked Barnes whether Paul Miller had told Barnes "why he wanted you to cash the check." Trial Tr. II at 11. The Government interrupted before Barnes could answer and informed the court at side-bar that Barnes would probably testify that she believed that Paul Miller had not had an opportunity to open a checking account since being released from prison. See id.

**5.** Barnes testified:

> He did mention that, you know, he had recently been in jail or whatever. So assuming myself—you know, people do need a break or a chance, you know.
>
> . . . .
>
> He had just mentioned he had just gotten out of jail. I was like, you know, maybe he is doing a special job or something for someone, and he didn't have a savings or checking account. So I didn't see any problem in [cashing the check]
>
> . . . .

Id. at 15, 16.

**6.** Paul Miller was sentenced to 1–3 years on each of the two counts against him, with the sentences to run consecutively. Leroy Miller received a suspended sentence. See Record Doc. No. 22.

## II. ANALYSIS

### A. *Paul Miller*

Paul Miller asserts that the District Court erred both in admitting the evidence of his prior conviction and in failing to issue a limiting instruction, and that each error furnishes an independent ground for reversal. Although we do not find the trial court's treatment of the disputed evidence to be wholly free of legal defect, we conclude that the disputed rulings do not warrant a reversal of Paul Miller's conviction.

### 1. Admission of the Evidence

#### a. General Test

The test for analyzing the admissibility of evidence of prior criminal convictions and other "bad acts" is well established. *See Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 1499–1500, 99 L.Ed.2d 771 (1988). "The threshold inquiry," imposed by Federal Rule of Evidence 404(b),[7] "is whether th[e] evidence is probative of a material issue other than character." 108 S.Ct. at 1499. "If offered for such a proper purpose, the evidence is [then] subject only to general strictures limiting admissibility," the most important of which being the requirement of Rule 403 that the probative value of the evidence not be "substantially outweighed" by its potential prejudice.[8] *Id.* at 1500. This two-step analysis—certification of a "proper" and relevant purpose under Rule 404(b), followed by the weighing of probity and prejudice under Rule 403—is firmly rooted in the law of this circuit. *See, e.g., United States v. Manner*, 887 F.2d 317, 321 (D.C.Cir.1989), cert. denied —— U.S. ——, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *United States v. Lavelle*, 751 F.2d 1266, 1275 (D.C.Cir.), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985).

#### b. Mann's Testimony

■ Mann's testimony satisfies the Rule 404(b) step of the analysis. Evidence of Mann's awareness of Paul Miller's criminal record was admitted not "to show action in conformity" with a criminal disposition, FED.R.EVID. 404(b), but rather to lend credence to Mann's claim that she feared for her safety if she did not comply with Paul Miller's demands for bogus checks. *See* Trial Tr. I at 10. Mann's state of mind was relevant to her credibility, a material issue in the case by virtue of Paul Miller's own trial strategy. *See* note 2 *supra*.[9]

Paul Miller resists this conclusion. Although he acknowledges that the "proper" material issues identified in Rule 404(b)—"motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"—are not "exhaustive, but merely illustrative," *United States v. Moore*, 732 F.2d 983, 987 n. 31 (D.C.Cir.

---

7. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
   FED.R.EVID. 404(b).

8. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
   FED.R.EVID. 403.

9. Although the trial court made its ruling on the admissibility of Mann's testimony immediately before the opening arguments of counsel, it apparently was plain by that point both to the parties and to the court that Paul Miller intend-

ed to challenge Mann's story. *See* Trial Tr. I at 8 (judge stating to defense counsel, "I take it you're going to cross-examine her and cast doubt on her credibility, and it's fairly obvious: why are you doing this."). Because the Government could "fairly anticipate [Paul Miller's] defense" that Mann had falsely implicated him in the check-forging scheme, it was entitled to preempt this line of argument through relevant bad-acts "evidence ... as part of its case in chief." *United States v. DeLoach*, 654 F.2d 763, 769 (D.C.Cir.1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981). *See generally* 2 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 404[09], at 404–62 to 404–63 (1989) ("Certainly, where it is apparent, e.g. from the opening statement, or previous proceedings, that a certain consequential fact will be in issue, the appellate courts have refused to find error in the admission of other crimes evidence as part of the Government's direct case." (footnotes omitted)).

1984), he nonetheless infers from this list that admission of bad-acts evidence is permissible under Rule 404(b) only if the evidence relates directly to the conduct of the *defendant. See* Brief for Appellant Paul A. Miller at 16–17. Citing two Fifth Circuit cases, *see United States v. Hernandez,* 750 F.2d 1256, 1258 (5th Cir.1985); *United States v. Wesevich,* 666 F.2d 984, 988 (5th Cir.1982), he concludes that "[d]emonstrating the state of mind of a witness . . . is not a purpose for which evidence of a prior conviction may be admitted pursuant to Rule 404(b)." Brief for Appellant Paul A. Miller at 15.

This argument misconceives the nature of Rule 404(b). The rule was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the *one impermissible* purpose for such evidence. "Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question." 2 J. WEINSTEIN & M. BERGER, *supra* note 9, ¶ 404[8] at 404–52. In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character. The Government's right to introduce bad-acts evidence for purposes other than showing a defendant's criminal propensity is by no means unlimited. But the limits derive from the "general strictures limiting admissibility such as Rules 402 and 403," not from Rule 404(b). *Huddleston,* 108 S.Ct. at 1500.[10]

◼ Paul Miller's argument that evidence of past bad acts can be submitted

only to prove issues relating to the *defendant's* conduct is inconsistent with case law in this and other circuits. In *United States v. Lewis,* 701 F.2d 972 (D.C.Cir. 1983), the District Court permitted the Government to elicit testimony that the defendant, on trial for gun possession, had been arrested on the basis of an outstanding warrant for assault. We affirmed, ruling expressly that the purpose for which the evidence had been introduced—to defend "the propriety of the behavior of the police" in response to the defendant's claim that he was the victim of manufactured charges—constituted a proper purpose for introduction of the evidence under Rule 404(b). *Id.* at 975. The Third and Eleventh Circuits, too, have held that Rule 404(b) permits the introduction of bad-acts evidence to prove material issues unrelated to the defendant's conduct, including "the witness' motives." *United States v. Scarfo,* 850 F.2d 1015, 1021 (3d Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *see United States v. Foster,* 889 F.2d 1049, 1053 (11th Cir.1989) (evidence of prior drug transaction "was necessary in order for the jury to understand why [witness] agreed to hide" defendant's illegal drugs). We believe that these cases are more in keeping with the structure of the Federal Rules generally and with Rule 404(b) in particular than are the Fifth Circuit cases cited by Paul Miller.

◼ The admission of Mann's testimony also satisfies the second, Rule 403, step of the *Huddleston* test. We review for abuse of discretion a trial court's ruling on whether the probity of prior-conviction evidence outweighs its potential for unfair prejudice, and "we lean towards admitting evidence in close cases." *Manner,* 887

---

10. Paul Miller unconvincingly argues that testimony concerning a defendant's past bad acts can never be even "arguably necessary" to establishing a witness' motivations, because "[a] witness can easily testify to his or her own state of mind without adverting to a prior conviction of a defendant." Brief for Appellant Paul A. Miller at 17. This suggestion indefensibly supposes that disclosure of *facts* known to a witness never advances the jury's understanding of why the witness behaved in a particular way. Miller may be attempting to argue that when the fact known to the witness was that the defendant had a criminal record, the marginal enhancement of a jury's understanding is outweighed by unfair prejudice to the defendant. In that case, however, Miller's argument would be attributing a function to Rule 404(b) that the Federal Rules assign to Rule 403.

F.2d at 322. The probity of the disputed portion of Mann's testimony is fairly strong; although it is true that Mann could have testified that she felt intimidated by Paul Miller without disclosing his criminal record, Paul Miller's theory of the case—that Mann had "profited" from the scheme and then "cut a deal with the United States Attorney's office to attempt to save herself," Trial Tr. I at 26—put Mann's credibility in issue, creating a need to bring Mann's awareness of Paul Miller's conviction to the jury's attention. *Cf. Lavelle,* 751 F.2d at 1277 (noting that "prosecution's need for the evidence" is important factor). The prejudicial impact of this evidence is debatable; knowledge of the bare fact that Paul Miller had previously been in jail may have induced a certain amount of speculation as to the nature of his conviction, but in context probably would not have caused the jury to infer that he had a propensity to engage in criminal behavior. In light of these considerations—all of which "are readily apparent from the record," *Manner,* 887 F.2d at 323—the trial court's determination that the risk of "unfair prejudice" did not "substantially outweigh[ ]" the probative value of the disputed testimony, FED.R.EVID. 403, cannot be said to constitute the " 'grave abuse' " of discretion necessary for reversal. *Manner,* 887 F.2d at 322 (quoting *United States v. Payne,* 805 F.2d 1062, 1066 (D.C.Cir.1986)).

■ Finally, Paul Miller claims that a subsequent allusion to his criminal record in the Government's closing argument magnified the prejudice of Mann's testimony, tipping the balance in favor of reversal. The offending statement was the Government's observation that "[c]ounsel could have explored more on the cross-examination about why [Mann] felt that threat. You didn't hear that, did you?" Trial Tr. II at 97. This comment, Paul Miller argues,

unfairly exploited the restraint that he was obliged to exercise in his cross-examination in order to avoid opening the door to further testimony by Mann concerning the details of his robbery conviction.

We are unpersuaded. Even accepting Paul Miller's characterization of the statement, it is not clear to us that the advantage derived by the Government was illicit; by giving Paul Miller the power to exclude the details of his conviction through voluntarily limiting the scope of his cross-examination, the trial court did not also give Miller the right to shield from the jury's attention his failure effectively to impeach Mann. In any event, the Government's statement responded expressly to Paul Miller's closing argument, which repeatedly voiced doubt concerning Mann's testimony. *See id.* at 84–85, 88. By pressing the issue in *his* closing, Paul Miller invited the Government's implicit reference to his conviction, *see Darden v. Wainright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *United States v. Burnett,* 890 F.2d 1233, 1241 (D.C.Cir.1989), a reminder consistent with the purpose for which the trial court properly admitted the evidence in the first instance, *see United States v. Boon San Chong,* 829 F.2d 1572, 1576 (11th Cir.1987). Viewed in context, the Government's comments, even if objectionable, did not unfairly prejudice Paul Miller.[11]

### c. Barnes' Testimony

■ Admission of the disputed portion of Barnes' testimony is less defensible. We have serious doubts about the admissibility of this evidence under Rule 404(b). The Government purportedly sought to elicit testimony that Barnes knew of Paul Miller's recent release from jail in order to prove a matter other than Miller's criminal propensity, namely Barnes' innocent moti-

---

11. Contrary to Paul Miller's contentions, our decision in *United States v. Rhodes,* 886 F.2d 375 (D.C.Cir.1989), does not support reversal in this case. In *Rhodes,* the Government introduced evidence of fraudulent activities that it conceded had no connection with the defendant,

and then in its closing expressly suggested the defendant's involvement in these activities. *See id.* at 378–81. In this case, in contrast, the Government permissibly elicited Mann's testimony and then made nonprejudicial use of that testimony in its closing.

vation in agreeing to cash a check for him. Insofar as Barnes already had admitted on direct examination that she received $2,000 from Paul Miller for cashing the check, this professed purpose is surely open to question. But even if we take this suggestion at face value, we are at a loss to connect Barnes' awareness of Paul Miller's record with any material issue in the case. Absent any advance indication that Paul Miller planned to put Barnes' state of mind in issue, there was no reason to allow Barnes' testimony. At a minimum, the trial court should have postponed its ruling on admissibility until after Paul Miller had conducted his cross-examination, in order to determine whether the proposed testimony would be relevant to any disputed question. *Cf. United States v. Rosse,* 418 F.2d 38, 41–42 (2d Cir.1969) (Government may not introduce bad-acts evidence relevant to matter not yet put in issue by defense), *cert. denied,* 397 U.S. 998, 90 S.Ct. 1143, 25 L.Ed.2d 408 (1970).

■ The Rule 403 inquiry is even less satisfying.[12] The probative value of Barnes' testimony was infinitesimal. Barnes' admission that she had received $2,000 seemed to make it perfectly clear why she agreed to cash the bogus check; indeed, her claim that she cashed the check on good-Samaritan grounds would appear to be patently pretextual. Furthermore, even if true, Barnes' testimony was irrelevant to any material issue in the case. The trial court reasoned that Barnes' testimony would not be unfairly prejudicial since evidence of Paul Miller's conviction was already before the jury. But because Barnes' testimony on her motivation had so little probity, we believe that the trial court abused its discretion in admitting this testimony.

■ Nonetheless, after carefully reviewing the record, we are constrained to find that the erroneous admission of Barnes' testimony was harmless. *See* FED.R. CRIM.P. 52(a). We will not upset a criminal conviction because of an erroneous evidentiary ruling "[i]f (1) the case is not close, (2) the issue not central, or (3) effective steps were taken to mitigate the effects of the error." *United States v. Hernandez,* 780 F.2d 113, 119 (D.C.Cir.1986). Both the first and second of these criteria are easily met. The strength of the Government's case against Paul Miller was overwhelming. In addition to Mann and Barnes, two other witnesses recounted in terms similar to the testimony furnished by Barnes their agreement to cash bogus checks supplied by Paul Miller, *see* Trial Tr. I at 110–13; Trial Tr. II 25–37; Miller put on no defense. Nor was the issue of whether Barnes acted innocently central to either her testimony or the case against Paul Miller generally. Consequently, admission of the disputed portion of Barnes' testimony does not warrant reversal.[13]

2. Failure to Issue a Limiting Instruction

■ Notwithstanding the absence of any request by trial counsel, Paul Miller argues that the District Court's failure to issue a limiting instruction constitutes an independent ground for reversal. In support of this contention, he relies on *United States v. Lewis,* 693 F.2d 189, 197 (D.C.Cir.1982), in which we held that the District Court must issue such an instruction *sua sponte* when "the evidence has the potential for substantially prejudicing the defendant." He also relies on the plain error doctrine. *See* FED.R.CRIM.P. 52(b).

Paul Miller's reliance on *Lewis* is without merit. Under the circumstances, we do not

---

**12.** Rule 403 analysis must be performed independently each time the Government proposes to introduce evidence of the defendant's prior criminal conviction. *See United States v. Zabaneh,* 837 F.2d 1249, 1264 n. 20 (5th Cir.1988).

**13.** The reference to Barnes' testimony in the closing argument for Leroy Miller does not

change this conclusion. The statement—"[t]he guy was just getting out of the slammer, and I am going to cash the check for him," *see* Trial Tr. II at 95—obviously was intended by defense counsel to deride the testimony of Barnes and did not invite the jury to draw an improper or prejudicial inference with regard to Paul Miller.

believe that admitting the disputed testimony without a limiting instruction "substantially prejudiced" Miller; viewed in context, the brief and noninflammatory references to Miller's criminal record were likely to be considered only in regard to the purpose for which they were admitted—to explain the motives of the witnesses for participating in the check-forging scheme.[14]  Paul Miller's suggestion that prior-conviction evidence *invariably* causes "substantial prejudice" is inconsistent with *Lewis'* express rejection of "the broad prophylactic rule that a trial court must give an immediate though unrequested cautionary instruction" whenever it admits evidence pursuant to Rule 404(b); "the burden ... to guard against any potential misuse of evidence," we made clear, should be borne by defense counsel, not by the trial court.  693 F.2d at 196.[15]

We are also faced here with a situation where "astute defense counsel may [have] prefer[red] tactically to forego [an instruction] in the interest of avoiding its inevitable focus of the jury's attention on the unfavorable evidence."  *United States v. Childs*, 598 F.2d 169, 176 (D.C.Cir.1979).  The inference that Paul Miller's counsel deliberately declined to request an instruction is strongly supported by the record, which indicates that when the trial court was considering whether to admit Mann's testimony, counsel for Leroy Miller *did* request that the court instruct the jury to consider the prior-conviction evidence only against Paul Miller, not against Leroy Miller.  *See* Trial Tr. I at 9; *see also id.* at 11 (court indicating that it would instruct jury "that this is admissible only in regard to the relations between her and Paul Miller").  It cannot credibly be maintained, then, that Paul Miller's counsel simply overlooked this option.

Finally, we reject Paul Miller's contention that the trial court's failure to issue an unrequested limiting instruction constituted "plain error."  Because, under these circumstances, the trial court had no obligation to issue an instruction *sua sponte*, there was *no error*, plain or otherwise.  *Cf. United States v. Blackwell*, 694 F.2d 1325, 1342 (D.C.Cir.1982) (error must be absolutely clear under settled law in order to fall within "plain error" doctrine).

### B.  *Leroy Miller*

Leroy Miller maintains that the evidence at trial does not support his conviction for the conspiracy charged in Count One.[16]  He bases this contention on two independent grounds.  First, he claims that the evidence does not satisfy the elements of conspiracy to commit bank fraud.  *See* Brief for Appellant Leroy Miller at 4–8.  Second, he maintains that the evidence at trial failed to prove the conspiracy *as charged* in Count One.  No evidence was introduced, Leroy Miller argues, linking him to the conspiracy at its alleged origin or showing that he communicated directly with Mann;

---

**14.**  This is not to say that the jury would necessarily find the testimony persuasive; as we have indicated, Barnes' profession of an innocent motive appears suspect.  Nonetheless, it does not follow that her testimony, viewed in context, would cause the jury to infer that Paul Miller has a propensity to commit crimes.

**15.**  This allocation of responsibility is clearly consistent with the intent of the Federal Rules:

When evidence which is admissible as to ... one purpose but not admissible as to ... another purpose is admitted, the court, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly.

FED.R.EVID. 105 (emphasis added); *see also Huddleston*, 108 S.Ct. at 1502 (identifying Rule 105 as one of four provisions constituting protection against unfair use of bad-act evidence).

**16.**  Count One reads as follows:

From on or about April 17, 1987, through and including May 11, 1987, within the District of Columbia and elsewhere, PAUL A. MILLER and LEROY MILLER, the defendants herein, did willfully, knowingly and intentionally combine, conspire, confederate and agree together and with each other and with other persons known and unknown to the Grand Jury to defraud the United States and to commit offenses against the United States, namely, to commit bank fraud in violation of 18 U.S.C. Section 1344.  Record Document No. 3, at 1.  The indictment also identifies the object of the conspiracy as "to defraud the Sovran/D.C. National Bank," and lists seven overt acts.  *Id.* at 1–3.

the evidence at best proved two or more *smaller* conspiracies: one between Mann and Paul Miller, and one or more between Paul Miller and Leroy Miller. This variance between the indictment and the proof at trial, Leroy Miller contends, mandates reversal. *See id.* at 8–14.

■ Both components of Leroy Miller's argument are unpersuasive. Evidence at trial demonstrated that Mann furnished bogus checks to Paul Miller, *see* Trial Tr. I at 43, that on at least one occasion Leroy Miller recruited a payee for one of the checks, *see* Trial Tr. II at 34–37, and that Leroy Miller himself was a payee for another of the checks, *see* Trial Tr. I at 64. From this evidence, a rational factfinder could easily infer that Leroy Miller agreed with Paul Miller and Count One's unindicted coconspirators intentionally and knowingly to commit bank fraud, and that either Leroy Miller or Paul Miller or both had engaged in an overt act in furtherance of that agreement. *See* 18 U.S.C. § 371.

■ The variance claim is equally devoid of merit. Whether the evidence presented at trial proves a single conspiracy is a matter of fact for the jury. *See United States v. Tarantino,* 846 F.2d 1384, 1391–92 (D.C.Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988). Given the coconspirators' common goal to defraud Mann's employer, and the general interdependence of their efforts to achieve that end, the jury's finding of a single conspiracy in this case is amply supported by the evidence. *See id.* at 1392–93. *See generally Blumenthal v. United States,* 332 U.S. 539, 557–58, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947). So long as their mutu-

al efforts contributed to the success of a common criminal design, it need not be shown that Leroy Miller knew or communicated with Mann or any other unnamed coconspirator. *See id.* at 558, 68 S.Ct. at 257. Nor need it be shown that Leroy Miller was complicit in the check-forging scheme from its inception in order to tie him to the charged conspiracy. *See, e.g., United States v. Bridgeman,* 523 F.2d 1099, 1107–08 (D.C.Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1744, 48 L.Ed.2d 206 (1976).[17] In sum, we find no error in the jury's verdict.

### III. Conclusion

None of the issues raised by the appellants warrants reversal. Testimony from one witness concerning her awareness of Paul Miller's criminal record was properly admitted to show the witness' motive for participating in the alleged check-forging scheme, while admission of similar testimony from a second witness was harmless error. The evidence amply supports Leroy Miller's conviction for conspiracy. We therefore affirm both convictions.

*Affirmed.*

---

**17.** At oral argument, counsel for Leroy Miller suggested that because Mann testified that she had been coerced into participating in the check-forging scheme, she could not have "agreed" to pursue its objectives. The upshot of this argument, as we understand it, would be that the Government failed to show the existence of a conspiracy until at least early May, resulting (supposedly) in a reversible variance between Count One and the proof at trial.

However, it does not follow that because she felt threatened, Mann, who the jury knew had pleaded guilty to embezzlement, was unable to "agree" to commit bank fraud for purposes of 18 U.S.C. § 371. Moreover, on the evidence adduced at trial, a rational factfinder could simply have refused to credit Mann's claim that she participated in the check-forging scheme out of fear rather than out of greed or friendship.